JUDGE SULLIVAN

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

14 CV 6937

| | |
|---|---|
| LRGP III, LLC and SLRA Inc., | Index No. |
| Plaintiffs, | |
| vs. | |
| CPP INVESTMENT BOARD REAL ESTATE HOLDINGS, INC., GOTHIC CORPORATION, INTERNATIONAL BANK OF RECONSTRUCTION AND DEVELOPMENT AS TRUSTEE FOR THE STAFF RETIREMENT PLAN AND TRUST AND THE RETIRED STAFF BENEFITS PLAN AND TRUST, LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, LIBERTY MUTUAL FIRE INSURANCE COMPANY, and EMPLOYERS INSURANCE COMPANY OF WAUSAU, | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| Defendants. | |



RECEIVED
AUG 26 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs LRGP III, LLC ("LRGP III") and SLRA Inc. ("SLRA") (collectively "Plaintiffs"), by and through the undersigned counsel, bring this Complaint seeking declaratory relief against Defendants CPP Investment Board Real Estate Holdings Inc., Gothic Corporation, International Bank of Reconstruction and Development as Trustee for the Staff Retirement Plan and Trust and the Retired Staff Benefits Plan and Trust, Liberty Mutual Insurance Company, Liberty Insurance Corporation, Liberty Mutual Fire Insurance Company, and Employers Insurance Company of Wausau ("Defendants"), and allege as follows:

### INTRODUCTION

1.      This suit is part of a larger dispute manufactured by certain limited partners ("Limited Partners") of two private equity funds – Liquid Realty Partners III, L.P. and Liquid

Realty Partners III-A, LP (the "Funds") – which are seeking to avoid paying fair value for essential services provided to the Funds by LRGP III, the Funds' general partner ("General Partner"), and LRGP III's affiliate, SLRA.

2.      The Funds' partnership agreements ("Partnership Agreements") expressly allow the Funds to employ or retain LRGP III's affiliates to provide services that would otherwise be performed by third parties on terms that are fair and reasonable.

3.      Nevertheless, when LRGP III caused the Funds to pay fair value for such services, the Limited Partners sought LRGP III's removal as General Partner of the Funds for paying those fees.

4.      On June 23, 2014, the Limited Partners sent a purported notice of removal to LRGP III (the "Notice of Removal") under both the no-fault removal and removal for cause provisions of the Partnership Agreements.

5.      The purported grounds for removal for cause under the Partnership Agreements arise from certain service fees (the "Service Fees") that LRGP III disbursed from the Funds as reasonable compensation for services performed by LRGP III's affiliate, Liquid Realty Advisors III, LLC and its successor entity, SLRA. (collectively, "SLRA" or the "Affiliate").

6.      As set forth herein, removal under the no-fault provisions of the Partnership Agreements is not permissible at this time because (1) valid notice of removal was not sent to LRGP III; (2) valid notices of appointment were not sent to LRGP III; (3) LRGP III has not received certain settlement payments that must be issued before any distributions to the Funds' investors and before any no-fault removal can occur under the Partnership Agreements; and (4) no replacement general partner has been duly appointed, as required under the Partnership Agreements.

7.     Defendants' attempt to remove LRGP III for cause is also improper, as LRGP III engaged in conduct expressly permitted by the Partnership Agreements – namely, the payment of reasonable fees for services provided to the Partnerships by LRGP III's Affiliate, SLRA.  As the Partnership Agreements expressly provide that the propriety of any removal for cause must be decided by an arbitrator, LRGP III has commenced an arbitration against Defendants contesting their attempt to remove LRGP III for cause.

8.     In deciding whether removal for cause of LRGP III is appropriate, the arbitrator must necessarily determine whether the Funds' payment of fees to the Affiliate was permissible under the Partnership Agreements.  Nevertheless, Defendants – who are also the Respondents in the arbitration – have argued before the arbitrator that the dispute over the permissibility of the Service Fees is outside the scope of the Partnership Agreements' arbitration clauses.

9.     This action seeks (1) declaratory relief stating that Defendants' notice of no-fault removal is deficient and fails to meet certain conditions precedent for removal under the Partnership Agreements and otherwise; (2) declaratory relief stating that Defendants' notices of appointment are deficient and fail to comply with the express terms of the Partnership Agreeements; and (3) in the event that the arbitrator finds that some portion of the parties' dispute over the Service Fees is not arbitrable, declaratory relief stating that the Service Fees were permissible under the Partnership Agreements.

## PARTIES

10.     Plaintiff LRGP III is a limited liability corporation incorporated in Delaware and headquartered in California.  LRGP's only member, Scott Landress, is a citizen of California.

11.     Plaintiff SLRA is a limited liability corporation incorporated in California and headquartered in California.

12.     Defendants are certain Limited Partners of the Funds.

13.    Defendant CPP Investment Board Real Estate Holdings Inc. is a Canadian corporation headquartered in Toronto, Canada.

14.    Defendant Gothic Corporation is a North Carolina corporation and registered 501(c)(3) organization headquartered in Raleigh, North Carolina.

15.    Defendant International Bank of Reconstruction and Development as Trustee for the Staff Retirement Plan and Trust and the Retired Staff Benefits Plan and Trust ("IBRD") are benefit plans for current and retired staff of the World Bank Group, a family of five international organizations.  IBRD's headquarters are located in Washington, D.C.

16.    Defendant Liberty Mutual Insurance Company is a Wisconsin corporation with its headquarters in Boston, Massachusetts.

17.    Defendant Liberty Insurance Corporation is a Wisconsin corporation with its headquarters in Boston, Massachusetts.

18.    Liberty Mutual Fire Insurance Company is an Illinois corporation with its headquarters in Boston, Massachusetts.

19.    Employers Insurance Company of Wausau is a Wisconsin corporation with its headquarters in Boston, Massachusetts.

## JURISDICTION AND VENUE

20.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) because there is diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.

21.    This Court has personal jurisdiction over all Defendants because they have consented to personal jurisdiction in New York in the Partnership Agreements.

22.    Venue is proper in this Court because each Defendant has consented to venue in this Court and there is personal jurisdiction over each Defendant in this Court.

# FACTS

## I.  BACKGROUND

23.    LRGP III is the General Partner of the Funds, which are private equity limited partnerships that invested the Limited Partners' capital commitments in real estate private equity "secondary" transactions.

24.    The Funds were sponsored by LRGP III, which is part of a larger group of affiliated and unaffiliated Liquid Realty entities specializing in real estate private equity secondary transactions (collectively, "Liquid Realty").

25.    Secondary transactions principally involve the purchase of pre-existing interests in real estate private equity funds from the limited or general partners of those funds or the recapitalization of such funds.

26.    Liquid Realty was the first private equity firm devoted exclusively to real estate private equity secondary transactions.

27.    The Funds were established in 2006 to acquire on a secondary basis a unique portfolio of diversified, high-quality real estate trust interests with underlying investments in core and value-added properties throughout the United Kingdom (the "Ursula Portfolio").

28.    Liquid Realty secured for the Funds the right to co-invest with an earlier Liquid Realty fund, Liquid Realty Partners II, LLC ("LRP II"), in the purchase of the Ursula Portfolio directly from a large European financial institution.

29.    The Limited Partners committed £400,402,425 to the Funds to purchase the majority of the Ursula Portfolio.  At the same time, LRP II committed capital to purchase the minority remainder of the Ursula Portfolio.

30.    LRGP III created a bespoke financial structure for secondary transactions whereby a portion of the Limited Partners' capital commitments were initially used as collateral

for an acquisition loan. That loan was later refinanced with term debt secured by the Project

Ursula assets. In another innovation, the Ursula Portfolio assets were held in a bare trust

structured to minimize Limited Partner taxation on operating income, saving investors in the

Funds and LRP II approximately £12.3 million in UK taxes.

## II.    THE PARTNERSHIP AGREEMENTS AND LRGP III's POWERS

31.    The Funds' highly similar Partnership Agreements vested LRGP III with a broad

array of powers as the Funds' General Partner.  In particular, LRGP III was entitled to appoint an

affiliate as the manager responsible for performing day-to-day investment advisory and

administrative services for the Funds.

32.    LRGP III exercised that power by appointing its Affiliate, SLRA, as the Funds'

manager.

33.    The investment managers appointed by the general partners of investment funds

that focus (like the Funds) on secondary transactions typically provide "passive" services such as

collecting information from underlying fund managers, analyzing and consolidating that

information, and conveying financial and performance data to the funds' limited partners.

34.    Due to the passive nature of the services that secondary fund general partners

provide, they typically charge lower investment management fees than those charged by the

general partners of the direct investment funds in which secondary funds generally invest.

35.    Consistent with that general rule, the Funds pay SLRA annual investment

management fees (the "Investment Management Fees") in four installments that equal 1.25% of

the Funds' net asset value (subject to various adjustments). In contrast, at the time of the Funds'

inception, direct investment funds often charged investment management fees as high as 2.00%

of committed or invested capital.

36.     LRGP III did not, however, play merely a passive role in the management of the Funds. Rather, LRGP III served an enhanced role in the operation of the Funds that required LRGP III's affiliates to provide active services to the Funds that fell well outside the scope of LRGP III's investment management services.

37.     The Funds' offering documents and the Partnership Agreements fully disclosed to the Limited Partners that LRGP III or its affiliates would play such an active role in the Funds' management, and that such affiliates would receive market rate compensation for the services it provided.

38.     That arrangement was fully consistent with the compensation structure adopted by many direct investment funds, which pay both investment management fees to general partners and additional fees to the general partners' affiliates for services that fall outside of the scope of the investment management services.

39.     The Partnership Agreements contemplated that LRGP III or its affiliates could: (a) engage in "transactions" opposite the Funds (such as selling Liquid Realty assets to the Funds, buying assets from the Funds, or providing financing to the Funds); or (b) provide "services" to the Funds that were outside of the scope of the services for which SLRA received the Investment Management Fees that would otherwise have to be performed by third parties (such as arranging, facilitating or managing the acquisition, financing or sale of the Funds' assets, or curing the Funds' debt covenant breaches).

40.     In the course of negotiating the Partnership Agreements, the Defendants secured the right to have LRGP III form an "Advisory Committee" for each Fund comprised of a subset of the Limited Partners in that Fund. Among other roles, the Advisory Committees were charged

with resolving conflicts presented to the Advisory Committees by LRGP III and approving any "transactions" between the Funds and LRGP III or its affiliates.

41.     LRGP III never presented any conflicts relevant to this action to either Advisory Committee, and LRGP III and its affiliates never undertook any "transactions" with the Funds, as the Partnership Agreements utilize that term.

42.     The Advisory Committees' roles with respect to the approval of transactions between the Funds and LRGP III or its affiliates are set forth in the same sections of the Partnership Agreements (§5.14) that contemplate the possibilities of conflicts arising in connection with "transactions" only:

> The Partnership, directly or with respect to any assets in which the Partnership is authorized to invest, may, as necessary or appropriate, engage in any transaction with or employ or retain [LRGP III] or any of its respective Affiliates to provide services (including, without limitation, administration, accounting, financing, investment-level management and servicing, legal, market research, mortgage financing and services in connection with the sale, exchange or liquidation of any or all of the Portfolio Investments) that would otherwise be performed for the Partnership by third parties on terms (including, without limitation, the consideration to be paid) that are determined by [LRGP III] to be fair and reasonable to the Partnership, and such Persons may receive from the Partnership (and any such other Person) compensation (including, without limitation, salary, salary related employment costs and expenses of the employees who provide such services and other overhead expenses allocable thereto, as reasonably determined by [LRGP III] based on the time expended by the employees who render such services or on a project-by-project basis) in addition to that expressly provided for in this Agreement; provided, however, the Advisory Committee must approve all such transactions.

## III.     THE CRITICAL SERVICES THAT THE AFFILIATE PROVIDED AND THE SERVICE FEES

43.     In addition to the unambiguous language of the Partnership Agreements, Liquid Realty disclosed to Defendants and other Limited Partners in advance of the Funds' closing in 2006 that the Funds would require, and would have to pay for, certain services beyond the scope of those covered by SLRA's Investment Management Fees.

44.     Liquid Realty made those disclosures to Defendants orally, in presentation materials regarding the Funds, and in financial projections made available to all potential investors in the Funds.

45.     Moreover, following the closing of the Funds, LRGP III regularly disclosed to Defendants and the other Limited Partners that LRGP III had secured for the Funds a wide variety of services that did not fall within the scope of the investment advisory and administrative services for which SLRA received the Investment Management Fees.

46.     The services performed by the Affiliate included: (a) identifying, negotiating and closing the acquisition of the Ursula Portfolio at a discounted price; (b) structuring that transaction to minimize taxes and at-risk capital for the Limited Partners; (c) structuring the debt utilized in acquiring the Ursula Portfolio to maximize early cash flow to the Limited Partners; (d) structuring the term loan utilized in replacing the Ursula Portfolio acquisition loan to release the Limited Partners' collateral and generate a distribution of refinancing proceeds to the Limited Partners; and (e) arranging early opportunistic sales of the Funds' assets to generate distributions of capital gains to the Limited Partners.

47.     Starting in 2007 with the beginning of the global financial crisis, LRGP III arranged for the Affiliate to provide significant additional services for the Funds that were designed to serve the primary goal of saving the Funds' assets from foreclosure and, thereby, preserving and returning as much capital as possible to the Limited Partners.

48.     The additional services that the Affiliate provided to the Funds during and after the global financial crisis included: (a) locating opportunities for and negotiating opportunistic sales of the Funds' assets, the proceeds of which were used to pay down debt balances to temporarily cure the Funds' loan breaches and to postpone lender foreclosure; (b) negotiating

debt covenant relief agreements that temporarily cured the Funds' loan breaches and postponed lender foreclosure; and (c) negotiating and effecting the recapitalization of the Funds to permanently cure the Funds' loan breaches and thwart the lenders' concerted efforts to foreclose on the Funds' assets.

49. Without these services, which had no precedent in previous Liquid Realty funds, the Limited Partners would have lost all of their unreturned capital.

50. LRGP III regularly advised the members of the Advisory Committees, including Defendants, that LRGP III had secured the performance of those services, which fell well outside of the scope of the 1.25% Investment Management Fees payable to SLRA in connection with the passive services it provided to the Funds.

51. The Limited Partners accepted the substantial benefits that those services produced without ever denying their value or propriety. While the Partnership Agreements entitled the Affiliate to the immediate payment of the Service Fees starting in 2006, LRGP III decided to defer collection of the Service Fees until 2014 for multiple reasons. Unless interest on the Service Fees is awarded to the Affiliate, its oral agreements to defer collection will amount to extending risky, interest-free loans to the Funds.

52. At first, LRGP III did not cause the Funds to pay the Service Fees related to the financing and acquisition of the Ursula Portfolio or the early sales of certain assets of the Funds. Rather, LRGP III distributed the full amount of the early asset sales and the refinancing proceeds to the Limited Partners. LRGP III had committed to the Limited Partners that it would maximize the Funds' cash flow to return Limited Partners' capital during the Funds' initial operating stage, and collecting Service Fees during this period would have significantly reduced the amount distributed to Limited Partners.

53.     By the time the Funds' independent audit firm completed the first audits of the Funds' financial statements in 2007, the Affiliate had earned the majority of its Service Fees. Collection of the Service Fees at that time was impracticable, however, because: (a) the global financial crisis had begun; (b) the Funds were not generating sufficient cash flow to pay the Service Fees; (c) the Funds' uncalled capital was reserved to defend its assets; and (d) the Funds' lender would not have released the Funds' dwindling collateral assets to pay the Service Fees.

54.     In 2010, when the Funds first generated sufficient cash flow to pay a portion of the Service Fees, LRGP III once again subordinated its interests to those of the Limited Partners by distributing that cash to the Limited Partners.

55.     In 2014, when the Funds' assets had been substantially liquidated, the Affiliate finally collected the Service Fees without interest.

56.     Contrary to claims that the Limited Partners made in connection with their efforts to remove LRGP III from its role as the Funds' general partner, generally accepted accounting principles did not require the accrual of the Service Fees at the time the Affiliate provided the related services; nor do the Partnership Agreements require greater disclosure of the Service Fees than the disclosures LRGP III made to the Limited Partners.

57.     Prior to 2013, it was impracticable for LRGP III to estimate the amount of the Service Fees that would be potentially collectible by the Affiliate.  The incremental fee-by-fee accrual the Limited Partners have advocated would also have rendered the Funds insolvent, much to the detriment of the Limited Partners.

58.     LRGP III will accrue the Service Fees in the Funds' 2013 audited financial statements because those fees first became determinable and collectable in 2013.

59.     By causing the Affiliate to provide a wide variety of services to the Funds before and during the global financial crisis and through the Funds' recovery from near ruin, LRGP III succeeded in limiting the Limited Partners' at-risk capital and preventing the Funds' lenders from foreclosing on the Funds' assets, thereby saving most of the Limited Partners' committed capital from irretrievable loss.

60.     While real estate-related investments made in the same general time frame as the Funds' acquisition of the Ursula Portfolio were devastated by the global financial crisis, LRGP III and its affiliates succeeded in significantly out-performing funds of a comparable vintage. To date, the Funds have returned 65% of invested capital to their Limited Partners (about three times better the median 2006 vintage real estate fund, which has returned only 22% of invested capital), while additionally retaining significant capital reserves and rights to future asset and balance sheet distributions from the underlying funds the Funds invested in.

61.     To the Limited Partners' additional benefit, LRGP III and the Affiliate secured those results while charging the Funds *far lower* total fees (*i.e.,* the sum of the Investment Management Fees, the Service Fees and third party fees) than: (a) LRGP III initially projected and disclosed; or (b) a general partner providing services similar to those provided to the Funds typically would have charged.

## IV.     DEFENDANTS SENT A DEFICIENT NOTICE OF REMOVAL AND INAPPROPRIATELY SEEK TO REMOVE LRGP III FOR CAUSE

### A.     For Cause Removal

62.     The Funds are now winding down long after LRGP III arranged for the Affiliate to perform the services that have salvaged most of the Limited Partners' investments.

63.     After accepting the substantial benefits that those services provided to the Limited Partners, Defendants have concocted the contention that the Affiliate is not entitled to *any* payment for the services it performed.

64.     Defendants now claim that the Affiliate should not receive *any* Service Fees because LRGP III allegedly did not obtain Advisory Committee "approval" to retain the Affiliate to perform those services.

65.     In other words, Defendants seek a windfall for the Limited Partners amounting to £16,254,023 because LRGP III supposedly failed to obtain an administrative approval.

66.     LRGP III has rejected Defendants' demand that it cause the Affiliate to reimburse the Service Fees to the Funds because: (a) the Partnership Agreements directly contradict Defendants' contention that LRGP III required Advisory Committee approval to pay the Affiliate for the substantial, critical services it provided to the Funds; and (b) in any event, the Affiliate's performance of those services did not have the material adverse effect upon the Funds that would be required by the Partnership Agreements to justify the repayment of the Service Fees.

67.     Undeterred by the unambiguous wording of the Partnership Agreements, Defendants have decided to attempt to strong-arm LRGP III by invoking the General Partner removal terms of the Partnership Agreements.

68.     In particular, on June 25, 2014, Defendants provided LRGP III with a grossly defective Notice of Removal that purports to remove LRGP III from its role as General Partner of the Funds pursuant to both the no-fault and for cause removal provisions of the Partnership Agreements.

69.     Under the Partnership Agreements, a for cause removal of LRGP III from its role as the Funds' general partner requires an arbitrator's determination that LRGP III engaged in certain "bad boy" acts that the agreements identify as the sole bases justifying "for cause" removals.

70.     Specifically, each Partnership Agreement limits the so-called "bad boy" acts permitting a for cause removal to:

> (i) any action by [LRGP III] that constitutes fraud against the Partnership, (ii) any material uncured action or failure to act by [LRGP III] that constitutes gross negligence, willful misconduct, bad faith or a material violation of law in the performance of its duties to the Partnership, (iii) the violation by [LRGP III] of its fiduciary obligations to the Partnership, or (iv) any willful breach by [LRGP III] of the material terms of this Agreement; in all cases which has had a material adverse effect on the Partnership.

71.     In their defective Notice of Removal, Defendants falsely claim that LRGP III committed each of those bad boy acts by paying the Service Fees without Advisory Committee approval, and that each of those acts had a material adverse effect on the Funds.

B.     No Fault Removal

72.     The Notice of Removal, dated June 23, 2014, also incorrectly purported to give notice of no-fault removal under the terms of the Partnership Agreements. Section 5.6(a) of the Partnership Agreement for the first Fund (Liquid Realty Partners III, L.P.) states:

> No Fault Removal.  At any time after the second anniversary of the Closing Date, at least five (5) unaffiliated Ursula Partners (excluding, except as provided in the first proviso of this sentence, any Affiliate Partners) holding at least 66-2/3% of the Total Percentage Interests may send notice to the General Partner that effective no earlier than sixty (60) days following receipt by the General Partner of such notice and upon payment to it as specified below, it will be removed as the General Partner of the Partnership; provided, however, that with respect to the AIV Partners, the general partner of the AIV Entities will pass through the vote to the AIV Partners and to the extent any AIV Partner does not vote, such AIV Partner shall not be considered an Ursula Partner for purposes of the definition of Total Percentage Interests; provided further that such removal shall not become effective until a successor General Partner is admitted pursuant to the provisions of Section 5.6(c) hereof. Upon removal pursuant to this Section 5.6(a), the

General Partner shall be due the accrued Investment Management Fee due to it as of the date of termination plus an amount equal to the Investment Management Fee it would have been entitled to during the twelve (12) month period after the date of termination. Any amounts payable to the General Partner hereunder shall be paid from available cash flow of the Partnership prior to any distributions to Limited Partners pursuant to Section 9.1.

73.     Section 5.6(a) of the Partnership Agreement for the second Fund (Liquid Realty

Partners III-A, L.P.), states:

> No Fault Removal. At any time after the second anniversary of the Closing Date, at least five (5) unaffiliated Ursula Partners (excluding, except as provided in the first proviso of this sentence, any Affiliate Partners) holding at least 66-2/3% of the Total Percentage Interests may send notice to the General Partner that effective no earlier than sixty (60) days following receipt by the General Partner of such notice and upon payment to it as specified below, it will be removed as the General Partner of the Partnership; provided, however, that with respect to the AIV Partners, the general partner of the AIV Entities will pass through the vote to the AIV Partners and to the extent any AIV Partner does not vote, such AIV Partner shall not be considered an Ursula Partner for purposes of the definition of Total Percentage Interests; provided further that such removal shall not become effective until a successor General Partner is admitted pursuant to the provisions of Section 5.6(c) hereof. Upon removal pursuant to this Section 5.6(a), the General Partner shall be due (i) the accrued Investment Management Fee due to it as of the date of termination plus an amount equal to the Investment Management Fee it would have been entitled to during the twelve (12) month period after the date of termination, plus (ii) its Carried Interest determined on the assumption that the Partnership was liquidated on the date of termination of the General Partner and each of the Portfolio Investments were sold for an amount equal to the value of such Portfolio Investment as most recently reported to the Partnership by such Portfolio Investment and the proceeds (after payment of all liabilities and expenses) were distributed to the Partners in accordance with this Agreement. Any amounts payable to the General Partner hereunder shall be paid from available cash flow of the Partnership prior to any distributions to Limited Partners pursuant to Section 9.1.

74.     As the foregoing provisions make clear, there are at least three conditions

precedent to the no-fault removal of the Funds' General Partner. First, the General Partner must

be given valid notice of at least sixty days before removal can take place. (Removal will occur

"no earlier than sixty (60) days following receipt by the General Partner of such notice").

Second, the General Partner must be in receipt of specified settlement fees. (Removal of General

Partner is "effective....upon payment to it as specified below"). Third, the General Partner's

successor must be properly appointed in place of the General Partner and its affiliates.

("Removal shall not become effective until a successor General Partner is admitted pursuant to

the provisions of Section 5.6(c) hereof."). Only upon the satisfaction of all three elements may

the General Partner be compelled to resign and to permit its replacement.

75.      Defendants have not met any of these requirements. First, Defendants have failed

to provide the General Partner with valid notice of removal. Rather, their Notice of Removal

expressly prohibits the Funds and LRGP III from taking actions necessary to remove a general

partner under the no-fault removal provisions of the Partnership Agreements.

76.      Specifically, the Notice of Removal states that "LRGP III, LLC shall not take any

further actions to remove funds from the partnership accounts."

77.      However, as expressly set forth in section 5.6(a) of the Partnership Agreements,

"the General Partner shall be due the accrued Investment Management Fee due to it as of the

date of termination plus an amount equal to the Investment Management Fee it would have been

entitled to during the twelve (12) month period after the date of termination." Section 5.6(a)

further provides that all such payments "shall be paid from available cash flow of the Partnership

prior to any distributions to Limited Partners pursuant to Section 9.1." Because Defendants'

Notice of Removal purports to prohibit the payment of the aforementioned settlement fees, it is

facially deficient and thus invalid.

78.      Second, LRPG III has not yet received the settlement fees to which it is entitled.

As discussed above, the Partnership Agreements call for the Funds' General Partner to be paid

certain settlement fees *prior* to removal and replacement. Moreover, under the Partnership

Agreements, the general partner of a fund managed by an affiliate of LRGP III – LRI Holding

Vehicle, LP (the "Jersey Fund") – must resign from the Jersey Fund when LRGP III is removed as General Partner of the Funds.  Just as LRGP III is entitled to fees before resignation under the Partnership Agreements, the general partner of the Jersey Fund is entitled to fees under the Jersey Fund partnership agreement ("Jersey Fund Partnership Agreement") prior to resignation. As Defendants have not taken the steps required to satisfy the Partnership Agreements' settlement requirement (and, in fact, have expressly prohibited such steps from occurring), no-fault removal and replacement of the General Partner cannot proceed at this time.

79.     Third, the General Partner cannot be removed until a suitable replacement General Partner has been appointed.  Otherwise, the Funds would be unmanaged and subject to regulatory and tax risks.

80.     Defendants and other limited partners have failed to appoint a replacement General Partner in accordance with the requirements set forth in Section 5.6(c) of the Partnership Agreements.  Section 5.6(c) of the Partnership Agreement for the first Fund (Liquid Realty Partners III, L.P.), states:

> Replacement General Partner. If the General Partner is removed, a successor shall only be admitted as a general partner of the Partnership (the "Replacement General Partner") if the following terms and conditions are satisfied: (i) the admission of such Person shall have been approved by Limited Partners holding at least 80% of the Percentage Interests within ninety (90) days following such event; (ii) the Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart hereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a general partner as of the effective date of the removal of the former General Partner that the newly admitted General Partner is authorized to and shall continue the business of the Partnership without dissolution and (iii) an amended and restated certificate of limited partnership of the Partnership evidencing the withdrawal of the prior General Partner and the admission of such Person as a general partner of the Partnership shall have been filed for recordation. Upon removal of the General Partner, the General Partner shall resign from each limited partnership in which it serves as a general partner and shall cause its Affiliate to resign as general partner of the Jersey Fund in each case effective upon the appointment of a Replacement

General Partner. The General Partner shall also transfer to the Replacement General Partner any shares owned by the General Partner which entitles it to appoint directors in any subsidiaries of the Partnership.

81.     Section 5.6(c) of the Partnership Agreement for the second Fund (Liquid Realty Partners III-A, L.P.), states:

Replacement General Partner. If the General Partner is removed, a successor shall only be admitted as a general partner of the Partnership (the "Replacement General Partner") if the following terms and conditions are satisfied: (i) the admission of such Person shall have been approved by Limited Partners holding at least 80% of the Percentage Interests within one hundred twenty (120) days following such event; (ii) the Person shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart hereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a general partner as of the effective date of the removal of the former General Partner that the newly admitted General Partner is authorized to and shall continue the business of the Partnership without dissolution and (iii) an amended and restated certificate of limited partnership of the Partnership evidencing the withdrawal of the prior General Partner and the admission of such Person as a general partner of the Partnership shall have been filed for recordation. Upon removal of the General Partner, the General Partner shall resign from each limited partnership in which it serves as a general partner and shall cause its Affiliate to resign as general partner of the Jersey Fund in each case effective upon the appointment of a Replacement General Partner. The General Partner shall also transfer to the Replacement General Partner any shares owned by the General Partner which entitles it to appoint directors in any subsidiaries of the Partnership.

82.     On August 22, 2014, Defendants provided LRGP III with grossly defective and back-dated notices of appointment ("Notices of Appointment") that purport to replace LRGP III as General Partner for each of the Funds pursuant to the general partner replacement provisions of the Partnership Agreements.

83.     As set forth above, the Partnership Agreements list extensive preconditions for the replacement of the General Partner, several of which the Defendants have ignored in their entirety.

18

84.     For example, LPRG III has not resigned from the Funds or the Jersey Fund. Further, as discussed above, LPRG III has not received the payments that it is entitled to under the Partnership Agreements prior to resignation.

85.     Furthermore, the vote to replace the General Partner was taken without adequate disclosures. By depriving minority limited partners of material information concerning the ramifications of a vote in favor of replacing LRGP III and the conflicts of interest that Defendants faced in connection with that vote, Defendants breached the fiduciary obligation of candor they owed to the minority limited partners.

86.     As Defendants have failed to satisfy the conditions that must occur prior to the appointment of a replacement, LRGP III may not be removed as the Funds' General Partner.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### (Declaratory Relief: No-Fault Removal Is Impermissible Under the Partnership Agreements)

87.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

88.     Plaintiffs seek declaratory relief that the Notice of Removal was defective under the Partnership Agreements, and that the conditions precedent for no-fault removal of the Funds' General Partner have not been met under the express terms of the Partnership Agreements. Specifically, in addition to serving a defective Notice of Removal, the General Partner has not been provided with settlement fees pursuant to section 5.6(a) of the Partnership Agreements or section 5.5 of the Jersey Fund Partnership Agreement, and a suitable General Partner has not been appointed pursuant to the terms of sections 5.6(a) and 5.6(c) of the Partnership Agreements.

89.     The dispute between Plaintiffs and Defendants is a real and substantial controversy within the Court's jurisdiction.

90.     It is likely that this dispute will be conclusively resolved through a favorable declaration that the Notice of Removal is invalid and the conditions under which no-fault removal may be effected under the Partnership Agreement have not been met.

91.     Accordingly, the requested declaratory relief should be granted.

## SECOND CAUSE OF ACTION
### (Declaratory Relief: The Notices of Appointment are Invalid Under the Partnership Agreements)

92.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

93.     Plaintiffs seek declaratory relief that the Notices of Appointment fail to comply with the terms of the Partnership Agreements, and are therefore invalid.

94.     The dispute between Plaintiffs and Defendants is a real and substantial controversy within the Court's jurisdiction.

95.     It is likely that this dispute will be conclusively resolved through a favorable declaration that the Notices of Appointment are invalid and the conditions under which the Limited Partners may appoint a successor to LRGP III have not been met.  Accordingly, the requested declaratory relief should be granted.

## THIRD CAUSE OF ACTION
### (Declaratory Relief: The Partnership Agreements Permits the Service Fees Paid to the Affiliate)

96.     Plaintiffs re-allege each and every allegation above as if fully set forth herein.

97.     In the event that the arbitrator finds that the dispute over the Affiliate's Service Fees is not arbitrable, Plaintiffs seek a declaration that the service fees were permissible under the Partnership Agreements and fair to the Funds.

98.    The Partnership Agreements unambiguously authorized LRGP III to retain the Affiliate to provide services to the Funds and to pay the resulting Service Fees. In fact, in the absence of these services – which the Affiliate performed on payment terms that the Funds could not have obtained elsewhere – the Limited Partners would have lost most or all of their committed capital amidst the significant upheaval in the world's real estate industry that accompanied the global financial crisis.

99.    The dispute between Plaintiffs and Defendants is a real and substantial controversy within the Court's jurisdiction. It is likely that this dispute will be conclusively resolved through a favorable declaration that the Service Fees paid by the Funds were permissible under the Partnership Agreements and fair to the Funds.

100.   Plaintiffs are therefore entitled to a declaration that the Service Fees were properly paid by the Funds to the Affiliate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for relief and judgment against Defendants as follows:

1. A declaration that Defendants' Notice of Removal and Notices of Appointment are defective and invalid.

2. A declaration that LRGP III was entitled to retain the Affiliate and pay the Service Fees to the Affiliate for the essential services that the Affiliate provided to the Funds;

3. An award to Plaintiffs of their attorney's fees, costs, and such other and further relief that this Court may deem just and appropriate.

**DATED:** August 26, 2014.

**FLEISCHMAN LAW FIRM, PLLC**

Keith M. Fleischman
565 Fifth Avenue, Seventh Floor
New York, NY 10017
(212) 880-9567

**STONE BONNER & ROCCO LLP**
James P. Bonner
145 West 45th Street, Suite 701
New York, New York 10036
(212) 239-4340

*Attorneys for Plaintiffs*