## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LRGP III, LLC and SLRA INC.,

                Plaintiffs,

    v.

CPP INVESTMENT BOARD REAL ESTATE
HOLDINGS, INC., GOTHIC CORPORATION,
INTERNATIONAL BANK OF
RECONSTRUCTION AND DEVELOPMENT AS
TRUSTEE FOR THE STAFF RETIREMENT
PLAN AND TRUST AND THE RETIRED STAFF
BENEFITS PLAN AND TRUST, LIBERTY
INSURANCE CORPORATION, LIBERTY
MUTUAL FIRE INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY,
and EMPLOYERS INSURANCE COMPANY OF
WAUSAU,

                Defendants.

Civil Action No. 14 cv 6937-RJS


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION

Keith M. Fleischman
THE FLEISCHMAN LAW FIRM
565 Fifth Avenue, Seventh Floor
New York, New York 10017
(212) 880-9567

James P. Bonner
Patrick L. Rocco
STONE BONNER & ROCCO LLP
145 West 45th Street, Suite 701
New York, New York 10036
(212) 239-4340

*Counsel for Claimant LRGP III, LLC*
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ...............................................................................................1

THE RELEVANT FACTS.........................................................................................................4

    A.  The Parties And The Funds........................................................................................4

    B.  The Management Fees And The Service Fees............................................................4

    C.  The GP's Deferral And Subsequent Payment Of The Service Fees ...................................7

    D.  The LP Defendants' Defective Notice Of Removal .......................................................10

    E.  The Pending Arbitration .................................................................................11

ARGUMENT ........................................................................................................................13

I.   THE EXACTING STANDARDS GOVERNING PRELIMINARY INJUNCTION MOTIONS ....................13

II.  THE UNTIMELY NATURE OF THE LP DEFENDANTS' MOTION
     DEMONSTRATES THAT NO NEED EXISTS FOR INJUNCTIVE RELIEF .........................................14

III. THE LP DEFENDANTS HAVE NOT MADE THE RIGOROUS FACTUAL SHOWING
     REQUIRED TO JUSTIFY INJUNCTIVE RELIEF..............................................................................14

    A.  The LP Defendants Cannot Show That They Will Suffer Irreparable Harm
       Absent A Preliminary Injunction ..................................................................................14

         1.  The LP Defendants Will Suffer No Harm If The GP Retains Its Role
            As The Funds' General Partner..............................................................................14

         2.  The LP Defendants' Speculation That The GP Could Dissipate Fund
            Assets Does Not Establish The Requisite Irreparable Harm ................................16

    B.  The LP Defendants Have Not Satisfied Their Burden Of Demonstrating A
       Substantial Likelihood That They Will Prevail On The Merits.........................................16

         1.  The LP Defendants Have Not Established That They Have Properly
            Removed The GP Under Either The Cause Or No Fault Removal
            Provisions Of The LPAs .........................................................................................16

         2.  The LP Defendants Cannot Establish That They Have Satisfied The
            LPAs' Requirements For Appointing A New General Partner ............................19

C.  The Balance Of Hardships Weighs Strongly Against Issuing A Preliminary Injunction ...................................................................................................................19

D.  Public Interest Does Not Weigh In Favor Issuing A Preliminary Injunction ....................21

E.  No Basis Exists For Enjoining The Arbitration ................................................................21

IV. IF THE COURT GRANTS A PRELIMINARY INJUNCTION, IT SHOULD REQUIRE THE LP DEFENDANTS TO POST A SUBSTANTIAL BOND ..................................................................24

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Almontaser v. New York City Dept. of Educ.*,
  519 F.3d 505 (2d Cir. 2008) ................................................................................13

*AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*,
  2009 WL 1707910 (Del. Ch. June 16, 2009) ........................................................17

*Argus Media Ltd. v. Tradition Fin. Services Inc.*,
  2009 WL 5125113 (S.D.N.Y. Dec. 29, 2009) ......................................................24

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (U.S. 2011) ..........................................................................20, 21

*Bd. of Educ. of Sussex County Vocational-Technical Sch. Dist. v. Sussex Tech Educ. Ass'n*,
  1998 WL 157373 (Del. Ch. Mar. 18, 1998) ..........................................................21

*Bell v. Cendant Corp.*,
  293 F.3d 563 (2d Cir. 2002) ................................................................................21

*Connecticut v. Massachusetts*,
  282 U.S. 660 (1931) ............................................................................................19

*CRP/Extell Parcel I, L.P. v. Cuomo*,
  394 Fed. Appx. 779 (2d Cir. 2010) ......................................................................16

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) ............................................................................................21

*Dedon GmbH v. Janus et Cie*,
  WL 4227309 (S.D.N.Y. Oct. 19, 2010),
  *aff'd*, 411 Fed. Appx. 361 (2d Cir. 2011) ............................................................23

*Delaware Pub. Employees v. New Castle County*,
  1994 WL 515291 (Del. Ch. Aug. 25, 1994) ........................................................21

*E.S. Originals Inc. v. Totes Isotoner Corp.*,
  734 F. Supp. 2d 523 (S.D.N.Y. 2010) ..................................................................22

*Flight Options Intern., Inc. v. Flight Options, LLC*,
  2005 WL 5756537 (Del. Ch. July 11, 2005) ........................................................15

*Ford v. Reynolds*,
  316 F.3d 351 (2d Cir. 2003) ................................................................................16

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980) ............................................................................................16

*General Fireproofing Co. v. Wyman*,
444 F.2d 391 (2d Cir. 1971) ...............................................................................19

*Ghassabian v. Hematian*,
2008 WL 3982885 (S.D.N.Y. Aug. 27, 2008) ....................................................21

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
13 F. Supp. 2d 417 (S.D.N.Y. 1998) ..................................................................14

*Gildor v. Optical Solutions, Inc.*,
2006 WL 4782348 (Del. Ch. June 5, 2006) ........................................................17

*Goggin v. Vermillion, Inc.*,
2011 WL 2347704 (Del. Ch. June 3, 2011) ........................................................15

*Guzzetta v. Serv. Corp.*,
7 A.3d 467 (Del. 2010) ........................................................................................25

*Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*,
898 F. Supp. 2d 610 (S.D.N.Y. 2012),
*aff'd*, 518 Fed. Appx. 20 (2d Cir. 2013) ............................................................21

*In re Arbitration between Halcot Navigation Ltd. P'ship & Stolt-Nielsen Transp. Group*,
491 F. Supp. 2d 413 (S.D.N.Y. 2007) ................................................................23

*Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*,
407 F. Supp. 2d 483 (S.D.N.Y. 2005) ................................................................15

*John Hancock Mut. Life Ins. Co. v. Barnes*,
1992 WL 101610 (Del. Ch. May 11, 1992) ..................................................13, 15

*Johnson & Johnson v. Guidant Corp.*,
2014 WL 3728598 (S.D.N.Y. July 22, 2014) .....................................................18

*Johnson Controls, Inc. v. A.P.T. Critical Sys.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004) ................................................................24

*McLaughlin Gormley King Co. v. Terminix Intern. Co., L.P.*,
105 F.3d 1192 (8th Cir. 1997) ............................................................................21

*NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*,
948 A.2d 411 (Del. Ch. 2007),
*aff'd*, 945 A.2d 594 (Del. 2008) .........................................................................18

*No Spray Coal., Inc. v. City of New York*,
   252 F.3d 148 (2d Cir. 2001)...................................................................13

*Olin Corp. v. Am. Home Assur. Co.*,
   704 F.3d 89 (2d Cir. 2012)....................................................................19

*Pharmaceutical Soc'y of New York, Inc. v. New York State Dep't of Social Servs.*,
   50 F.3d 1168 (2d Cir. 1995)..................................................................25

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)....................................................................15

*SCF Arizona v. Wachovia Bank, N.A.*,
   2010 WL 5422505 (S.D.N.Y. Dec.14, 2010) .......................................18

*Seda Specialty Packing Corp. v. Am. Safety Closure Corp.*,
   1995 WL 404821 (S.D.N.Y. July 7, 1995) ...........................................13

*See Doctor's Associates, Inc. v. Distajo*,
   107 F.3d 126 (2d Cir. 1997)..................................................................23

*Seidensticker v. Gasparilla Inn, Inc.*,
   2007 WL 4054473 (Del. Ch. Nov. 8, 2007) ........................................18

*Siemens Info. Sys., Inc. v. TPI Enterprises, Inc.*,
   1987 WL 34117 (S.D.N.Y. Dec. 30, 1987) ..........................................22

*Sokolowski v. Metro. Transp. Auth.*,
   723 F.3d 187 (2d Cir. 2013)..................................................................23

*Stott v. Capital Fin. Servs.*,
   277 F.R.D. 316 (N.D. Tex. 2011) .........................................................20

*Temple Univ. v. White*,
   941 F.2d 201 (3d Cir. 1991)..................................................................25

*Transperfect Translations Intern., Inc. v. Merrill Corp.*,
   2004 WL 2725032 (S.D.N.Y. Nov. 30, 2004),
   *aff'd*, 159 Fed. Appx. 313 (2d Cir. 2005) ...........................................14

*WS Int'l, LLC v. M. Simon Zook, Co.*,
   2014 WL 1870623 (3d Cir. May 9, 2014) ...........................................25

Plaintiffs LRGP III, LLC (the "GP") and SLRA Inc. (the "Affiliate") respectfully submit this memorandum in opposition to the motion for a preliminary injunction filed by: (a) the defendant limited partners (the "LP Defendants") in Liquid Realty Partners III, L.P. ("LRP III") and Liquid Realty Partners III-A, L.P. ("LRP III-A").[1]

<h2>PRELIMINARY STATEMENT</h2>

The LP Defendants wish to void the payment of fees (the "Service Fees") earned by the Affiliate, which is part of the larger Liquid Realty Partners organization ("Liquid Realty"), for critical services the Affiliate performed for LRP III and LRP III-A (collectively, the "Funds"). In furtherance of that baseless effort, the LP Defendants, which are institutional investors in the Funds, seek a preliminary injunction that: (a) prevents the GP (the Funds' general partner) from continuing to carry out the Funds' business; (b) forces the GP to surrender its general partner position to ARC prior to the completion of numerous steps necessary to effectuate the orderly transition the LP Defendants purportedly desire; (c) freezes $27 million of the assets of the principal of the Affiliate (Scott Landress) without citing any statute or case law that would justify that injunctive relief although Landress has already committed to maintain those funds in a domestic account; and (d) stays the arbitration in which the LP Defendants have actively participated for two and one-half months (the "Arbitration") in favor of a litigation they did not initiate although the Arbitration will fully resolve the LP Defendants' contentions.

The LP Defendants fall far short of establishing their entitlement to any of the extraordinary relief they seek. Contrary to their principal argument, they have not satisfied the conditions for removing the GP as the Funds' general partner under the no fault removal provisions of the Funds' limited partnership agreements (the "LPAs"). Under both LPAs, a Fund's limited partners (the "Limited Partners") can effect a no fault removal of the GP only by

---

[1] The LP Defendants also contend that their motion is brought on behalf of non-parties LRP III, LRP III-A and ARC (GP1) Ltd. ("ARC"), which the LP Defendants propose to intervene.

providing proper notice of that intention and paying the GP "the accrued Investment Management Fee due to it as of the date of termination plus an amount equal to the Investment Management Fee it would have been entitled to during the twelve (12) month period after the date of termination." Instead of honoring these contractual terms, the notice by which the LP Defendants supposedly removed the GP (the "Notice of Removal") explicitly barred the GP from paying the mandatory Investment Management Fees (the "Management Fees"). Accordingly, the LP Defendants cannot effect a no fault removal of the GP.

The defective Notice of Removal did also purport to remove the GP for Cause, as the LPAs define that term. To conduct a for Cause removal, however, the LP Defendants must establish in the Arbitration that the LPAs mandate in connection with any for Cause removal that the GP engaged in certain contractually specified "bad boy" acts that had a materially adverse effect upon the Funds. Here, the LP Defendants falsely contend that the GP committed such misconduct by improperly agreeing to pay the Service Fees for the critical services the Affiliate admittedly performed. The LP Defendants advance that contention even though: (a) the LPAs *directly contradict* their claim that the GP had to seek the approval of the Funds' "Advisory Committees" of limited partners to retain the Affiliate to provide "services" the Funds required; (b) the LP Defendants have never questioned the quality of the services the Affiliate provided or that, without those services, the LP Defendants would have lost most or all of the capital they invested in the Funds; and (c) during the months of discussions that preceded the issuance of the Notice of Removal, the LP Defendants never stated that the amount of the Service Fees was excessive or that any of the services the Affiliate provided fell within the scope of those for which the Funds paid the Management Fees. As a result, the LP Defendants cannot establish that any basis currently exists for removing the GP from its role as the Funds' general partner.

Furthermore, the LP Defendants have matters completely backward when they assert that the Court should stay the first-filed Arbitration in which they have actively participated for two and one-half months. Since the parties agreed in the LPAs that only an arbitrator can make the Cause determination and that proceeding is likely (if not certain) to resolve all issues regarding the payment of the Service Fees, the Arbitration should proceed unabated.

The LP Defendants' request that the Court enjoin the dissipation of the funds paid for the Service Fees is a red herring. Several months ago, Landress committed to maintain those funds in a domestic account. The LP Defendants were satisfied with that commitment then. They never sought additional assurances from the GP or Landress, who has enjoyed a long and highly successful career in multiple facets of the real estate and private equity industries. Thus, no risk of dissipation of the Service Fees payments exists. In any event, payment of the Service Fees complied in all respects with the LPAs' terms because – contrary to the LP Defendants' contentions – the LPAs did not require Advisory Committee approval of those fees.

Given the LP Defendants' efforts to impugn Landress, it bears emphasis that the LP Defendants have rushed forward to replace the GP without giving any thoughtful consideration to the implications of their actions. As the GP long ago informed the LP Defendants, the ramifications of replacing the GP should be considered closely before the LP Defendants take that step. At the same time, the GP has offered to step aside, and spare the parties significant attorneys' fees, once that orderly process is completed. The LP Defendants ignored that sensible suggestion, however, because they prefer to create the false appearance that leaving the GP in charge of the Funds places their assets at risk.

Actions speak louder than words in that regard, however. The LP Defendants learned that the GP had paid the Affiliate the Service Fees in February of 2014. For seven months, the LP Defendants did nothing to restrain the GP's ability to manage the Funds' affairs. Indeed, it

was not until *Plaintiffs* initiated this lawsuit that the LP Defendants concocted the claim that they harbor concerns regarding the safety of the Funds' assets under the GP's management. That fable is particularly incredible because some LP Defendants have invested in other Liquid Realty funds, but no LP Defendant has taken any steps to replace the general partners of those funds.

The true reason why the LP Defendants seek the GP's removal is provided by their motion to have the Funds and ARC intervene in this litigation. Since the beginning of the parties' discussions regarding the Service Fees, the LP Defendants have repeatedly requested that the GP reimburse them for their legal expenses from the Funds' assets. Thus, the effort to remove the GP arises as a result of the LP Defendants' efforts to pass the responsibility for *their* legal fees off on the Funds, not because of legitimate concerns regarding the GP's future actions.

<u>**THE RELEVANT FACTS**</u>

**A.** **The Parties And The Funds**

The GP is the general partner of the Funds, which are private equity limited partnerships that invested the Limited Partners' capital commitments in real estate private equity "secondary" transactions. *See* Declaration of Scott M. Landress ("Landress Decl.") at ¶ 7. Secondary investments typically involve the purchase of pre-existing interests in private equity funds from the limited or general partners of those funds or the recapitalization of such funds. *Id.* at ¶ 8. The LP Defendants are large, sophisticated institutional investors. *Id.* at ¶ 9.

**B.** **The Management Fees And The Service Fees**

The GP fully disclosed to the LP Defendants that, as was frequently true with respect to similar investment funds, the Funds would pay Liquid Realty's affiliates two types of fees. *Id.* at ¶ 10. First, the management company appointed by the GP ("LRA III," which was succeeded by SLRA) received a Management Fee equal to 1.25% of the Funds' net asset value ("NAV") for performing the passive investment advisory and administrative services typical of secondary

fund managers. *Id.* at ¶ 11; LRP III LPA at § 5.9(a); LRP III-A LPA at § 5.9(a). Those passive services include collecting information from underlying fund managers, analyzing and consolidating that information, conveying financial and performance data to the Funds' limited partners, and calling or distributing investor capital. Landress Decl. at ¶ 11.

Due to the passive nature of the services that secondary fund general partners provide, their appointed management companies typically charge lower management fees than those charged by the management companies of the direct investment funds in which secondary funds generally invest. *Id.* at ¶ 12. Consistent with that general rule, at the time of the Funds' inception, direct investment funds often charged management fees as high as 2.00% of committed or invested capital. *Id.* at ¶ 13.

The GP's affiliates did not play merely a passive role in the Funds' management. Rather, they provided active services that fell well outside those for which LRA III received Management Fees. *See id.* at ¶ 14. In particular, the GP's Affiliate played an integral role in acquiring, financing and selling the Fund's assets, and in preventing the Funds' lenders from foreclosing upon those assets. *Id.* at ¶ 15.

The GP fully disclosed in the LPAs that it would retain its affiliates to provide those essential services. *Id.* at ¶ 16; LRP III LPA at § 5.14; LRP III-A LPA at § 5.14. Indeed, the GP and the Limited Partners engaged in substantial negotiations regarding the specific LPA terms that memorialize the GP's authority to retain the Affiliate to provide those services. Landress Decl. at ¶ 17. The GP also prepared, and made available to the Limited Partners, detailed projections regarding the fees the Funds were expected to incur for services that fell outside the scope of the Management Fee. *Id.* at ¶ 18. Notably, the overall fees the GP projected significantly exceeded the total of the Management and Service Fees the Funds have paid to date

even though the global financial crisis resulted in the Affiliate performing far more extensive services for the Funds than the GP had envisioned. *See id.* at ¶ 19 and Ex. 3.[2]

The LPAs also provide the Limited Partners with the right to have the GP form a separate "Advisory Committee" for each Fund comprised of a subset of that Fund's investors. *Id.* at ¶ 20; LRA III LPA at § 5.13; LRA III-A LPA at § 5.13. The Advisory Committees were charged with approving any "transactions" between the Funds and the GP or its affiliates (such as selling Liquid Realty assets to the Funds, buying assets from the Funds, or providing financing to the Funds). Landress Decl. at ¶ 21. The GP and its affiliates never undertook any "transactions" with the Funds, as the LPAs utilize that term. *Id.*

In sharp contrast to the Advisory Committees' approval rights regarding "transactions" between the Funds and the GP or its affiliates, the LPAs do not provide for Advisory Committee approval of the GP's decisions to enlist its affiliates to provide "services" to the Funds that third parties would otherwise have to perform. *Id.* at ¶ 22. Rather, the LPAs dictate that the arrangements between the Funds and the GP's affiliates with respect to *services* provided to the Funds need only be "determined by [the GP] to be fair and reasonable" to the Funds. *Id.* at ¶ 23.

In that regard, the text of each LPA, including the "transactions"-specific proviso added by the Limited Partners during the negotiation of those agreements, states:

> The Partnership, directly or with respect to any assets in which the Partnership is authorized to invest, may, as necessary or appropriate, engage in any ***transaction*** with ***or*** employ ***or*** retain [the GP] or any of its respective Affiliates to provide ***services*** (including, without limitation, administration, accounting, financing, investment-level management and servicing, legal, market research, mortgage financing and services in connection with the sale, exchange or liquidation of any or all of the Portfolio Investments) that would otherwise be performed for the Partnership by third parties on terms (including, without limitation, the consideration to be paid) that are determined by [the GP] to be fair

---

[2]   Specifically, the GP's projections estimated that the Funds would pay total fees of £32,240,726 from inception in 2006 through 2012. *Id.* at ¶ 19. From inception through the payment of the Service Fees in 2014, the Funds actually paid below-budget fees of £27,471,880, a savings of £4,768,846 (or 15%). *Id.* at ¶ 19 and Ex. 3.

and reasonable to the Partnership, and such Persons may receive from the Partnership (and any such other Person) compensation (including, without limitation, salary, salary related employment costs and expenses of the employees who provide such services and other overhead expenses allocable thereto, as reasonably determined by [the GP] based on the time expended by the employees who render such services or on a project-by-project basis) in addition to that expressly provided for in this Agreement; <u>provided</u>, <u>however</u>, the Advisory Committee must approve all such ***transactions***.

*Id.* at ¶ 24; LRP III LPA at §5.14(a) (italics and bold added); LRP III-A LPA at § 5.14(a) (same).

Even falsely assuming that those terms require Advisory Committee approval of the Affiliate's retention to provide "services," the LP Defendants seek a massive windfall by denying the Affiliate any payment solely because the GP failed to obtain that administrative approval. *See* Landress Decl. at ¶ 25. The result the LP Defendants propose would be particularly unfair because the Affiliate's services salvaged the Funds' assets from foreclosure, and the LP Defendants cannot even claim that the Advisory Committees would have refused to approve the Affiliate's retention or compensation. *Id.* at ¶ 26.[3]

**C.     The GP's Deferral And Subsequent Payment Of The Service Fees**

Consistent with the LPAs and the GP's previous disclosures, the GP retained the Affiliate to provide a wide variety of services for the Funds that third parties would otherwise have had to perform. Landress Decl. at ¶ 28. The GP consistently disclosed that the Funds were taking these steps, albeit without specifically referencing the various entities involved in providing services to the Funds, including the Affiliate and the Funds' law firms, accounting firms and other service providers. *See id.* at ¶ 31.

Shortly after the Funds began operations, the global financial crisis struck. *Id.* at ¶ 32. That crisis proved particularly devastating for leveraged investments in real estate, such as the

---

[3]   Hence, even if the LPAs had required the administrative step of Advisory Committee pre-approval of the GP's retention of the Affiliate to provide services, the Affiliate would be entitled to compensation for the services it provided under a quantum meruit theory. *See, e.g., Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994).

assets the Funds held. *Id.* As a result, during the crisis, the GP and the Affiliate exerted extensive efforts: (a) locating opportunities for and negotiating defensive sales of the Funds' assets; (b) negotiating debt covenant relief agreements that temporarily postponed lender foreclosure; and (c) negotiating and effecting the recapitalization of the Funds to permanently cure the Funds' loan breaches and thwart the lenders' concerted efforts to foreclose on the Funds' assets. *Id.* at ¶ 33.[4] These efforts protected the LP Defendants against the loss of a high percentage of their committed capital. *Id.* at ¶ 34. The quality of the services that the Affiliate delivered is demonstrated by the fact that the Funds' returns, while still below original projections, vastly outperformed those of similar-vintage funds. *Id.* at ¶ 38.[5]

The GP regularly advised the Limited Partners that the GP had secured those services, which fell well outside the scope of LRA III's management services. *Id.* at ¶ 35. The LP Defendants accepted the benefits of those services without ever questioning their value or propriety. *Id.* During months of discussions with the GP, the LP Defendants never challenged the amount of the Service Fees (£16,254,023) until *after* the GP pointed out the absence of any such contention in its Arbitration Statement of Claim. *Id.* at ¶ 36.

During the first fifteen months of the Funds' existence, the GP elected not to pay the Service Fees owed to the Affiliate because Landress had committed that the GP would maximize the distributions made during the Funds' initial stages. *Id.* at ¶ 39. By the time the Funds' first audit was completed in July 2007, the global financial crisis was in full swing, the Funds' lenders had taken control of the its bank accounts and were threatening to foreclose on its assets, and the

---

[4] A schedule of the transactions for which the Affiliate earned Service Fees is attached to the Landress Declaration as Exhibit 4. The GP long ago shared that schedule with the LP Defendants. Landress Decl. at ¶ 30.

[5] To date, the Funds have returned 65% of invested capital to their Limited Partners (about three times better than the median 2006 vintage real estate fund, which has returned only 22% of invested capital), while additionally retaining significant capital reserves and rights to future asset distributions. *Id.* at ¶ 38.

Funds had reserved uncalled capital commitments to stave off foreclosure. *Id.* at ¶ 40. As a result, the GP had to defer the payment of the Service Fees between 2007 and 2010. *Id.*

Contrary to the LP Defendants' contention, GAAP did not require accrual of the Service Fees on the Funds' financial statements beginning in 2007. The GP has obtained independent accounting advice that, because the collection of the Service Fees from the cash-strapped, highly leveraged Funds was in serious doubt, accrual would have been inappropriate. *See id.* at ¶ 41 and Ex. 6. In any event, accrual would have injured the LP Defendants by rendering the Funds insolvent. *Id.* at ¶ 42.

By 2010, the Funds had weathered the worst of the global financial crisis and possessed sufficient cash to pay a portion of the deferred Service Fee. *Id.* at ¶ 43. At that time, however, LRP III-A Advisory Committee memnber Peter Lewis of Liberty Mutual threatened that the GP would be removed if it paid the Affiliate rather than distributing the cash to the Limited Partners. *Id.* Again, therefore, the GP saw no choice but to defer payment of the Service Fee. *Id.*

At year-end 2013, however, the Funds had liquidated most of their assets and had sufficient cash on hand to pay the Service Fee in its entirety. *Id.* at ¶ 44. Accordingly, in January 2014, after reserving over £16 million that would have been lost but for the efforts of the GP and the Affiliate, the GP paid the Affiliate the £16.25 million in Service Fees the Affiliate had earned during the life of the Funds from 2006 through 2013. *Id.* at ¶ 45.

In February 2014, the GP notified the Limited Partners of that payment. *Id.* at ¶ 46. Before making the payment, the GP retained EisnerAmper LLP, an independent accounting and consulting firm, to consider the fairness of the amount of the Service Fees. *Id.* at ¶¶ 46-47 and Ex. 7. The EisnerAmper analysis confirmed that the Service Fees fell well within the range of similar fees charged by the affiliates of other general partners of private equity firms. *Id.* at ¶ 47

and Ex. 7. The GP will accrue the Service Fees in the Funds' 2013 audited financial statements because those fees first became determinable and collectable in 2013. *Id.* at ¶ 48.[6]

## D.    The LP Defendants' Defective Notice Of Removal

Between February and late June of 2014, the GP and the LP Defendants engaged in significant discussions regarding the LP Defendants' false contention that the LPAs did not authorize the payment of the Service Fees. *Id.* at ¶ 49. From the beginning of those discussions, the LP Defendants improperly insisted that the GP arrange to have their legal fees paid from the Funds' assets. *Id.* at ¶ 51.

While the parties engaged in months of discussions regarding the Service Fees, the LP Defendants never asserted that any service the Affiliate provided was unnecessary or inappropriate or that the Affiliate's performance was unsatisfactory. *Id.* at ¶ 55. The LP Defendants raised the contention that certain of the services performed by the Affiliate fell within the scope of those covered by the Management Fee only after the GP pointed out the absence of any such contention in its Arbitration Statement of Claim. *Id.* at ¶ 56.

Nearly four months after the LP Defendants received notice of the payment of the Service Fees, during which time the GP continued to manage the Funds' assets as normal, the LP Defendants served the GP with their defective Notice of Removal on June 25, 2014. *Id.* at ¶ 57. While the Notice of Removal purports to remove the GP under both the Cause and no fault provisions of the LPAs, it actually fails to effect either type of removal. *Id.* at ¶ 58.

First, by serving the Notice of Removal prior to the filing of an arbitration, the notice ignores the LPAs' dictate that a Cause determination must be made in connection with an arbitration and must *precede* a removal for Cause. *Id.* at ¶ 59; LRP III LPA at § 1.19; LRP III-A

---

[6] The LP Defendants emphasize the Funds' failure to produce audited financial statements for 2013. In fact, however, the audit work is complete, and the Funds' auditors have merely decided that they must await the resolution of this controversy before signing off on the audit. *Id.* at ¶ 64.

LPA at § 1.21.  Second, the LPAs specify that a no fault removal may only occur *after* the Funds pay all accrued Management Fees, plus the Management Fees that SLRA would earn in the ensuing twelve months.  *Id.* at ¶ 60; LRP III LPA at § 5.6(a); LRP III-A LPA at § 5.6(a).

Despite that requirement, the Notice of Removal demands that the GP not pay *any* fees to SLRA (or any other entity) prior to removal.  *Id.* at ¶ 62 and Ex. 8.  In effect, therefore, the LP Defendants seek to remove the GP for Cause (the only type of removal that can be accomplished without paying the additional year of Management Fees) before obtaining the required determination from an Arbitrator that Cause for removal exists.[7]

**E.        The Pending Arbitration**

On July 3, 2014, eight days after the LP Defendants served the Notice of Removal, the GP initiated the Arbitration with the AAA.  *Id.* at ¶ 72.  The LP Defendants have fully participated in the Arbitration.  They filed a 20-page Answer to the Statement of Claim and a motion to dismiss the GP's request that the arbitrator declare the payment of the Service Fees valid.  *Id.* at ¶ 73.  The LP Defendants have also participated in the arbitrator selection process, which has resulted in the selection of an arbitrator.  *Id.* at ¶ 74.  At no point during the pendency of the Arbitration did the LP Defendants suggest that the proceeding should be stayed, even after they challenged the ability of the arbitrator to determine the Service Fees' validity.  *Id.* at ¶ 75.

Contrary to the LP Defendants' contention, efficiency concerns provide no support for providing them with the Arbitration mulligan they seek.  In ruling whether "Cause" exists for the GP's removal, the arbitrator will necessarily determine whether the payment of the Service Fees was (as the GP contends) entirely appropriate or (as the LP Defendants contend) unauthorized

---

[7]   It is also notable that, in their haste to replace the GP, the LP Defendants have failed to consider many issues they must resolve to effect an orderly replacement of the GP and to safeguard the Funds' assets.  *See* Landress Decl. at ¶ 66.  As a result, the GP is resisting the LP Defendants' ill-conceived, hasty replacement efforts to protect the Funds' investors, including those with no involvement in this litigation.

and injurious to the Funds.  *See* LRP III LPA at § 1.19; LRP III-A LPA at § 1.21.  As a result, an unfavorable determination in the Arbitration for the GP (*i.e.,* a ruling that the Service Fees were not contractually authorized and had a material adverse effect on the Funds) will necessarily moot the Service Fees issues in this action.  A favorable ruling that the payment of the Service Fees was contractually authorized will have the same effect.

The LP Defendants also ignore that, even if this Court were to rule that the LPAs required the Advisory Committees to approve the payment of Service Fees to the Affiliate, that determination would neither terminate this litigation nor resolve the issues that the Arbitration presents.  Cause exists under the LPAs only when the GP engages in the requisite bad boy acts *and* that conduct exerts "a material adverse effect" on the Funds.  LRP III LPA at § 1.19; LRP III-A LPA at § 1.21.  That causation issue will remain for the Arbitrator irrespective of how this Court resolves the issue of the contractual propriety of the Service Fee payment because, in the absence of the services the Affiliate performed (particularly in recapitalizing the Funds in the midst of the global financial crisis), the Funds would have surrendered virtually all of their assets to their lenders.  *See* Landress Decl. at ¶ 32.

Furthermore, even if the LP Defendants prevail in this litigation with respect to the contractual propriety of the Service Fees, that ruling will not end the dispute.  After such a ruling, the Court would have to determine whether the Affiliate is entitled to payment for the services it provided to the Funds on a quantum meruit basis.  *See* note 3, *supra*.  Efficiency concerns therefore support directing the parties to complete the Arbitration that will likely resolve all of their disputes regarding the Service Fees in the contractually mandated forum.

## I.

### THE EXACTING STANDARDS GOVERNING PRELIMINARY INJUNCTION MOTIONS

To obtain a preliminary injunction, a party "must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in [movant's] favor." *Almontaser v. New York City Dept. of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal quotations omitted).[8] "[W]hen the injunction sought will alter rather than maintain the status quo the movant must show clear or substantial likelihood of success." *No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) (internal quotations omitted).

With respect to LP Defendants' request that Service Fees not be transferred or dissipated, the LP Defendants failed to inform the Court that Landress had agreed keep the contested funds in a domestic account long before the LP Defendants' moved for an *ex parte* Order to Show Cause.  Landress Decl. at ¶ 54.  Therefore, the issue is moot.

The LP Defendants' proposed injunction would change the *status quo* by preventing the GP from conducting the Funds' affairs.  *See John Hancock Mut. Life Ins. Co. v. Barnes*, 1992 WL 101610 (Del. Ch. May 11, 1992) ("The true *status quo* here is not that the general partner has been removed but rather that the limited partner is attempting to remove the general partner. An order removing the general partner would be a mandatory temporary restraining order seldom, if ever, granted.").  The LP Defendants also seek to change the *status quo* by halting the

---

[8] Contrary to the LP Defendants' argument, the federal standard governs the issuance of a preliminary injunction, regardless of what state's substantive law applies to the dispute.  *See Seda Specialty Packing Corp. v. Am. Safety Closure Corp.*, 1995 WL 404821, at *2 (S.D.N.Y. July 7, 1995).

ongoing Arbitration.  Consequently, to obtain injunctive relief, the LP Defendants must show a substantial likelihood of success on the merits, which they cannot do.

## II.

### THE UNTIMELY NATURE OF THE LP DEFENDANTS' MOTION DEMONSTRATES THAT NO NEED EXISTS FOR INJUNCTIVE RELIEF

"A party's delay in moving for preliminary injunctive relief undercuts the sense of urgency that typically accompanies such a motion, and a lengthy delay can altogether preclude the granting of a preliminary injunction."  *Transperfect Translations Intern., Inc. v. Merrill Corp.*, 2004 WL 2725032, at *4 (S.D.N.Y. Nov. 30, 2004), *aff'd*, 159 Fed. Appx. 313 (2d Cir. 2005); *see also Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.").  Here, the LP Defendants first sought injunctive relief six months after learning that the GP caused the Funds to pay the Service Fees to the Affiliate and over two and one-half months after the GP commenced the Arbitration.  This unexplained delay demonstrates the pretextual nature of LP Defendants' "dissipation of assets" concerns and underscores that the Court should enforce the parties' agreement to proceed with the Arbitration.  Even standing alone, therefore, the LP Defendants' delay justifies the denial of their motion.

## III.

### THE LP DEFENDANTS HAVE NOT MADE THE RIGOROUS FACTUAL SHOWING REQUIRED TO JUSTIFY INJUNCTIVE RELIEF

**A.   The LP Defendants Cannot Show That They Will Suffer Irreparable Harm Absent A Preliminary Injunction**

1.   The LP Defendants Will Suffer No Harm If The GP Retains Its Role As The Funds' General Partner

Having the GP, rather than ARC, perform the ministerial tasks involved in winding down the Funds will not cause the LP Defendants any harm, let alone irreparable injury.  As the LP

Defendants' cases hold, merely alleging interference with voting rights is insufficient to show irreparable harm. Rather, the movants must demonstrate that they will suffer an injury that is "imminent and genuine, as opposed to speculative."[9]

This case is analogous to *John Hancock*, where a limited partner who purported to remove the general partner sought a preliminary injunction "to enjoin the general partners from conducting themselves as the general partners of the Partnership." 1992 WL 101610, at *3. The Court held that the plaintiff failed to show irreparable harm because the only injury alleged was continued payment of fees to the general partner. Similarly, the LP Defendants' motion for preliminary injunction fails because they base their irreparable injury argument largely upon sheer speculation concerning the GP's potential dissipation of the Funds' assets.

This action is clearly distinguishable from the "control" cases that the LP Defendants cite where the moving party articulated specific and concrete harm that would befall them absent a preliminary injunction. In *Flight Options Intern., Inc. v. Flight Options, LLC*, the Court found irreparable harm to a minority shareholder where the majority shareholder was on the verge of entering into a transaction that would dilute the minority's shareholder's interest from 31% to 1%. 2005 WL 5756537 (Del. Ch. July 11, 2005) (*cited by* Def. Br. at 11). Similarly, in *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, the Court enjoined a transaction in which the plaintiff's fund would "give up a business worth $970 million for an illiquid 0.7 percent interest in a company that is dominated by [a controlling shareholder]." 407 F. Supp. 2d 483, 510 (S.D.N.Y. 2005) (*cited by* Def. Br. at 13). Here, by contrast, the Funds are winding

---

[9]   *Goggin v. Vermillion, Inc.*, 2011 WL 2347704 (Del. Ch. June 3, 2011) (failure to present shareholder proposal at annual meeting did not constitute irreparable harm) (*cited by* Def. Br. at 11); *see also Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (internal quotations omitted).

down, their assets consist predominantly of cash and no impending management decision or

transaction will impact the LP Defendants' investment returns.  *See* Landress Decl. at ¶ 6.

    2.   The LP Defendants' Speculation That The GP Could Dissipate
          <u>Fund Assets Does Not Establish The Requisite Irreparable Harm</u>

      The LP Defendants also cannot establish that the theoretical dissipation of the Funds'

assets through the payment of the GP's attorneys' fees constitutes the irreparable injury

necessary to support injunctive relief.  The LPAs contain detailed provisions concerning the

expenses for which the GP is entitled to reimbursement and indemnification.  *See* LRP III LPA

at §§ 5.10, 5.12; LRP III-A LPA at §§ 5.10, 5.12.  Assuming, for argument's sake, that the GP

reimbursed itself for any expense to which it had no entitlement, that "injury" would be easily

remedied by means of a damages payment.  Accordingly, injunctive relief is unavailable to

address the supposed "dissipation of assets" injury the LP Defendants posit.[10]

**B.**    **The LP Defendants Have Not Satisfied Their Burden Of Demonstrating
       A Substantial Likelihood That They Will Prevail On The Merits**

      1.   The LP Defendants Have Not Established That They Have Properly Removed The
           <u>GP Under Either The Cause Or No Fault Removal Provisions Of The LPAs</u>

      To effect a no fault removal of the GP, the LP Defendants had to provide the GP with a

valid Notice of Removal and 60 days' notice of the removal.  *See* LRA III LPA at § 5.6(a); LRA

III-A LPA at § 5.6(a).  As Plaintiffs explain above, the LP Defendants' Notice of Removal failed

to meet the LPAs' no fault requirements because it purported to preclude the Funds from paying

---

[10]   *See, e.g., FTC v. Standard Oil Co.,* 449 U.S. 232, 244 (1980) ("'Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'") (citation omitted); *Ford v. Reynolds,* 316 F.3d 351, 355 (2d Cir. 2003) ("To establish irreparable harm, the injury alleged 'must be one requiring a remedy of more than mere money damages.'") (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)); *see also, e.g., CRP/Extell Parcel I, L.P. v. Cuomo,* 394 Fed. Appx. 779, 782 (2d Cir. 2010) (plaintiff failed to make required showing of irreparable injury where it "adduced nothing more than conclusory assertions in support of its claim that one or more defendant-appellees might 'spend' the escrow monies and later become insolvent").

fees that the Funds were contractually obligated to pay to effect no fault removal. *See* Landress Decl. at ¶ 62 and Ex. 8 (Notice of Removal states that the GP "shall not take any further actions to remove funds from the partnership accounts"); LRP III and III-A LPAs at § 5.6(a) (removal of a general partner is only "effective….upon payment to [the general partner] as specified below").

The supposed inability of ARC or the LP Defendants to calculate the amount of the required fees has no significance. The GP could make the required calculation, but the LP Defendants have forbidden the payment and now *seek an injunction* enforcing their wishes. Those steps are irreconcilable with reliance on the LPAs' no fault removal provisions.[11]

The LP Defendants fare no better with their efforts to establish a substantial likelihood of success with respect to a Cause removal. The LP Defendants can remove the GP for cause only by establishing *in the Arbitration* both that: (a) the GP could not pay Service Fees without the Advisory Committees' approval; and (b) engaging the Affiliate to provide the relevant services had "a material adverse effect" on the Funds. Landress Decl. at ¶¶ 59-60; LRP III LPA at §§ 1.19, 5.14(a); LRP III-A LPA at §§ 1.21, 5.14(a). The LP Defendants make neither showing.

Taking the second issue first, it is uncontested that the Affiliate's services were essential in preventing foreclosure upon the Funds' assets. Landress Decl. at ¶ 26. Other services that the Affiliate performed were equally important to the Funds' ability to outperform comparable funds of a similar vintage. *Id.* at ¶¶ 26, 38. Thus, the LP Defendants cannot show that retaining the Affiliate exerted the requisite "material adverse effect" upon the Funds.

With respect to the first issue, the LP Defendants' arguments ignore the unequivocal terms *their counsel inserted* into the LPAs. *See id.* ¶ 24. As Plaintiffs demonstrate above,

---

[11] *See Gildor v. Optical Solutions, Inc.*, 2006 WL 4782348, *1 (Del. Ch. June 5, 2006) (party "required to comply substantially with . . . notice provision" in contract for notice to be effective); *see also AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, 2009 WL 1707910, at *7 (Del. Ch. June 16, 2009) ("It is a basic principle of contract law . . that to be entitled to specific performance . . . the party seeking specific performance must have substantially performed under the contract herself.").

§ 5.14(a) of each LPA authorizes the GP and its affiliates to "engage in any *transaction with*" the Funds "*or*" "*provide services*" to those entities. LRA III LPA(a) at § 5.14 ("The Partnership, directly or with respect to any assets in which the Partnership is authorized to invest, may, as necessary or appropriate, *engage in any transaction with or* employ *or* retain [the GP] or any of its respective Affiliates to *provide services . . .*") (emphasis assed).

At the end of that section of the LPAs, the LP Defendants' counsel inserted a proviso that granted the Advisory Committees authority to approve any "transactions" between the Funds and the GP or its affiliates. Critically, however, the proviso contains no such approval right with respect to the "services" the LPAs expressly differentiated from "transactions" *in the same paragraphs of the agreements. See id.* ("<u>provided</u>, <u>however</u>, the Advisory Committee must approve all such **transactions**") (emphasis added).

In these circumstances, blackletter rules of contractual interpretation dictate that the LP Defendants are bound by the words that their own counsel inserted into the LPAs. Specifically, the word "transaction" in § 5.14's proviso cannot have a broader meaning than the word "transaction" in the first sentence of the same section. *E.g., Johnson & Johnson v. Guidant Corp.*, 2014 WL 3728598, at *15 (S.D.N.Y. July 22, 2014) ("'[T]he general rule of contract construction presum[es] that words have the same meaning throughout the contract.'") (quoting *SCF Arizona v. Wachovia Bank, N.A.*, 2010 WL 5422505, at *6 (S.D.N.Y. Dec.14, 2010)). Indeed, interpreting the word "transactions" in the proviso to be synonymous with the "services" § 5.14 describes at great length would impermissibly render those provisions of the LPAs superfluous.[12] As a result, because the LPAs' unambiguous words clearly differentiate between

---

[12] *See Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) ("When interpreting contracts, this Court gives meaning to every word in the agreement and avoids interpretations that would result in superfluous verbiage.") (internal quotations omitted); *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include

(a) "transactions" between the Funds and the GP and its affiliates and (b) "services" provided to the Funds, the plain meaning of those agreements forecloses the LP Defendants' self-interested interpretation of their terms.  *See Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("words and phrases [in a contract] should be given their plain meaning").

> 2.  The LP Defendants Cannot Establish That They Have Satisfied The LPAs' Requirements For Appointing A New General Partner

The LP Defendants have also failed to carry their burden of demonstrating the validity of the supposed Notices of Appointment of ARC as the Funds' general partner.  In particular, the LP Defendants ignore that the sections of both LPAs that concern the appointment of a successor general partner begin with the phrase, "If the General Partner is removed . . . ."  LRP III LPA at § 5.6(c); LRP III-A LPA at § 5.6(c).  Thus, before the Limited Partners can *replace* the GP, they must validly *remove* the GP.  For the reasons described above, the LP Defendants have failed to carry their burden of demonstrating that they have completed the contractually mandated steps for removing the GP.  The supposed Notices of Appointment are therefore invalid.

## C.   The Balance Of Hardships Weighs Strongly Against Issuing A Preliminary Injunction

The LP Defendants offer only pure speculation to support their contention that the balance of "hardships" tips in their favor.  With respect to replacing the GP, the LP Defendants' speculative injury consists exclusively of the possibility that the GP will dissipate the Funds' assets by using them to pay the GP's attorneys' fees.  This trumped up concern has no basis in fact and cannot support an award of injunctive relief.  *General Fireproofing Co. v. Wyman*, 444 F.2d 391, 393 (2d Cir. 1971) ("An injunction 'will not be granted against something merely feared as liable to occur at some indefinite time in the future.'") (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).

---

superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 945 A.2d 594 (Del. 2008).

Rather, throughout the course of the parties' dispute concerning the Service Fees, the GP and the Affiliate have been paying their own legal fees. *See* Landress Decl. at ¶ 52. As one would expect, the LPAs provide for the GP to be indemnified for those fees once it is determined that the LP Defendants have improperly attempted to recoup the Service Fees. *See* LRP III LPA at § 5.12; LRP III-A LPA at § 5.12. Until that determination is made, however, Plaintiffs will continue to pay their legal fees. Landress Decl. at ¶ 52.

On the other hand, from the parties' first contact regarding the Service Fees, the LP Defendants have been requesting that the GP utilize the *Funds'* assets to pay *their* legal fees although no provision of the LPAs would permit such an expenditure. *See* Landress Decl. at ¶ 51. Accordingly, only the GP faces the possibility that this action and the Arbitration will be improperly paid for with the Funds' assets.

Furthermore, removing the GP from its role as general partner before the Funds have satisfied their obligation to pay the accrued Management Fees and those scheduled to be paid over the next twelve months will deprive the GP of its hard-bargained rights and impose substantial financial hardship on the GP. As a result, the balance of the hardships with respect to the issue of removing the GP from control of the Funds tips decidedly in the GP's favor.

Substantial precedent also demonstrates the hardship associated with denying the GP its contractual right to have the issue of whether Cause exists for its removal decided in the Arbitration. As the courts have repeatedly recognized, the Federal Arbitration Act "reflect[s] both a 'liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that arbitration is a matter of contract' . . . ." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (U.S. 2011) (citations omitted).

Thus, staying the Arbitration would deny the GP the fundamental contract right to have its agreements with the LP Defendants honored. *See, e.g., Stott v. Capital Fin. Servs.*, 277

F.R.D. 316, 337 (N.D. Tex. 2011) (the "substantive contractual right to arbitration" "is protected by the statutory provisions of the Federal Arbitration Act and the strong federal policy within the court system in favor of arbitration"). In contrast, enforcing those contract rights will impose no hardship on the LP Defendants. *E.g., Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales,* 898 F. Supp. 2d 610, 618 (S.D.N.Y. 2012) ("Plaintiff faces no hardship in arbitrating claims it agreed to arbitrate."), *aff'd*, 518 Fed.Appx. 20 (2d Cir. 2013).[13]

## D.    The Public Interest Does Not Weigh In Favor Issuing A Preliminary Injunction

The LP Defendants have also failed to articulate any public interest that would be furthered by granting their motion. This is merely a garden variety private dispute, and no court has found that comparable unsubstantiated allegations implicated any public interest.

## E.    No Basis Exists For Enjoining The Arbitration

The LP Defendants cannot advance any colorable basis for staying the Arbitration in which they have answered the GP's Statement of Claim and selected an arbitrator. *See* Landress Decl. at ¶¶ 73-74. As *Concepcion* and countless other cases demonstrate, the Federal Arbitration Act ("FAA") adopted a "'liberal federal policy favoring arbitration.'"[14] As a result, where – as is indisputably true here – the parties have agreed to arbitrate a dispute, federal courts lack the

---

[13] The cases cited by the LP Defendants are inapposite because they concern stays of arbitration where the disputes were not arbitrable. *See* Def. Br. at 14-15 (citing *McLaughlin Gormley King Co. v. Terminix Intern. Co.*, *L.P.*, 105 F.3d 1192, 1194 (8th Cir. 1997) (staying case where disputed issues were not arbitrable), *Bd. of Educ. of Sussex County Vocational-Technical Sch. Dist. v. Sussex Tech Educ. Ass'n*, 1998 WL 157373, at *5 (Del. Ch. Mar. 18, 1998) (same), and *Delaware Pub. Employees v. New Castle County*, 1994 WL 515291, at *4 (Del. Ch. Aug. 25, 1994) (defendants have shown "more than a reasonable probability of success on the merits of their claim that disputes. . .  are not arbitrable")).

[14] *Concepcion*, 131 S. Ct. at 1745 (citations omitted); *accord, e.g., Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)  (noting that the FAA "requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation"); *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Where the scope of an arbitration agreement is ambiguous, the Federal Arbitration Act's policy favoring arbitration requires that any doubts ... be resolved in favor of arbitration.") (internal quotations omitted).

power to stay arbitration. *Ghassabian v. Hematian*, 2008 WL 3982885, at *2 (S.D.N.Y. Aug. 27, 2008) ("[T]he FAA does not provide for petitions ... brought by the party seeking to stay arbitration.") (internal quotations omitted).

The LP Defendants' contention that this action may moot, and is duplicative of, the Arbitration (Def. Br. at 15) is not accurate. To the contrary, as Plaintiffs demonstrate above (*see* pp. 11-12), the Arbitration is nearly certain to eliminate all issues with respect to the payment of the Service Fees because the arbitrator will have to determine whether Cause existed for the termination of the GP as the Funds' general partner. In short, if payment of the Service Fees was appropriate, the arbitrator will determine that no Cause existed for the GP's removal. In contrast, if the arbitrator finds that Cause existed for the GP's removal, this Court will have no issues to resolve with respect to the contractual propriety of the fees. The interests of efficiency – and the parties' agreements – therefore counsel in favor of permitting the Arbitration to proceed.

The LP Defendants' argument that disputed issues over the Service Fees fall outside the scope of the arbitration clauses also lacks merit. Def. Br. at 14. Where the parties have agreed to a narrow arbitration clause contemplating arbitration of specified issues, as is the case here, "the court must determine whether the parties' dispute is over an issue that is on its face within the purview of the clause."[15] In this case, to determine whether for Cause removal is permissible, the arbitrator must determine: (1) whether the GP's payment of Service Fees violated the LPAs, (2) whether such violation, if any, was willful and (3) whether the Funds were adversely impacted by payment of the Service Fees, *i.e.,* whether the Funds did not receive valuable services in exchange for the Service Fees. Consequently, all disputed issues related to Service Fees fall squarely within the LPAs' arbitration clauses.

---

[15]  *E.S. Originals Inc. v. Totes Isotoner Corp.*, 734 F. Supp. 2d 523, 529 (S.D.N.Y. 2010); *see also Siemens Info. Sys., Inc. v. TPI Enterprises, Inc.*, 1987 WL 34117, at *1 (S.D.N.Y. Dec. 30, 1987) (where an arbitration clause is narrow, issues that are "inextricably intertwined with claims falling within [the scope of the arbitration clause]" are arbitrable).

The LP Defendants also falsely contend that Plaintiffs have requested that the Court rule on issues related to the Service Fees. Def. Br. at 15. Contrary to that assertion, Plaintiffs have only requested declaratory relief related to whether the Service Fees are contractually permissible in the unlikely event that the arbitrator decides that this issue is not arbitrable. *See* Complaint at ¶ 97 ("In the event that the arbitrator finds that the dispute over the Affiliate's Service Fees is not arbitrable, Plaintiffs seek a declaration that the service fees were permissible under the Partnership Agreements and fair to the Funds.").

Plaintiffs' request for declaratory relief concerning issues related to the purported no fault removal and appointment of a replacement general partner also does not affect their right to arbitrate disputes related to the Cause removal. *See Doctor's Associates, Inc. v. Distajo*, 107 F.3d 126, 132 (2d Cir. 1997) ("[L]itigation of non-arbitrable claims does not waive a party's right to arbitrate other, arbitrable claims.").

In any event, the LP Defendants have waived their right to request that the Court, rather than the arbitrator, decide the arbitrability of issues related to Service Fees. "[I]f a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration." *Sokolowski v. Metro. Transp. Auth.*, 723 F.3d 187, 191 (2d Cir. 2013) (internal quotations omitted). In *In re Arbitration between Halcot Navigation Ltd. P'ship & Stolt-Nielsen Transp. Group*, the court held that a party waived its right to have the Court decide whether an issue was arbitrable after it requested that the arbitrator decide the issue. 491 F. Supp. 2d 413, 419 (S.D.N.Y. 2007). Similarly, the LP Defendants waived any right they possessed to request that the Court make the determination of arbitrability when they requested that the arbitrator

dismiss claims related to the propriety of the Service Fees because such claims were not arbitrable.  *See* Landress Decl. at ¶ 73.[16]

The LP Defendants' observation that the LPAs' forum selection clauses dictate that all non-arbitrable disputes must be brought in this Court also provides no basis for staying the Arbitration.  Those clauses specifically exclude "the determination of [removal for] Cause," which must be decided by an arbitrator.  *See* LRA III LPA at § 16.11.  As discussed above, the Cause determination necessarily requires adjudication of disputed issues related to the Service Fees.  Those issues therefore fall within the scope of the LPAs' arbitration clause.

As the LP Defendants point out, they hypothetically could bring a (meritless) action to recover the Service Fees from the Affiliate in this Court.  Def. Br. at 15.  In those circumstances, staying the hypothetical litigation in favor of the ongoing Arbitration would conserve judicial resources and reduce the burdens of litigation on the parties.  *See Argus Media Ltd. v. Tradition Fin. Services Inc.*, 2009 WL 5125113, at *3 (S.D.N.Y. Dec. 29, 2009) ("[N]umerous courts have held that where arbitrable and non-arbitrable claims arise out of the same set of facts, a stay usually is appropriate in the interest of judicial efficiency, because the arbitration may decide the same facts at issue in the litigation.").  Therefore, disputed issues related to Service Fees should be heard in the Arbitration.

## IV.

### IF THE COURT GRANTS A PRELIMINARY INJUNCTION, IT SHOULD REQUIRE THE LP DEFENDANTS TO POST A SUBSTANTIAL BOND

The purpose of requiring a bond is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained.  *Johnson Controls, Inc. v. A.P.T. Critical*

---

[16] This case is distinguishable from *Dedon GmbH v. Janus et Cie*, where the defendants sought "immediate judicial determination" of arbitrability before submitting the issue to the arbitrator. 2010 WL 4227309, at *8 (S.D.N.Y. Oct. 19, 2010), *aff'd*, 411 Fed. Appx. 361 (2d Cir. 2011).

*Sys.*, 323 F. Supp. 2d 525, 541 (S.D.N.Y. 2004). "Generally, the amount of the bond posted is the limit that a wrongfully restrained party may recover. Thus, . . . the court should attempt to limit the possibility that a restrained party that is ultimately successful on the merits is not able to obtain adequate relief." *Id.* at 541. Accordingly, as noted in the lead case the LP Defendants cite, "[b]ecause actual damages are uncertain and because a wrongfully enjoined party has no recourse other than the security, the Court should 'err on the high side' in setting the bond." *Guzzetta v. Serv. Corp.*, 7 A.3d 467, 470 (Del. 2010).

Plaintiffs contend that the Funds owe them $1.26 million in accrued and annual Management Fees. *See* Landress Decl. at ¶¶ 60-61. Moreover, the Funds (which are winding down) will owe Plaintiffs substantial indemnification payments for legal fees in this proceeding and the Arbitration if the Service Fees were properly paid. *See* LRP III LPA at § 5.12; LRP III-A LPA at § 5.12. As a result, "err[ing] on the high side," the Court should require a bond of no less than $2.5 million. The LP Defendants' cases do not remotely suggest a contrary result.[17]

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court deny the LP Defendants' Motion for a Preliminary Injunction.

---

[17] *See Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) (observing that exceptions to Rule 65's bond requirement are so rare that "the requirement is almost mandatory" (*id.* at 219, n. 25), but upholding the waiver of a bond under the narrow "non-commercial and public interest" exception to Rule 65 because the non-profit hospital that obtained the injunction would have been bankrupted had the court not compelled defendant to pay Medicaid reimbursements owed to the hospital (*id.* at 220) and "virtually no risk existed for [the defendant] in advancing funds to [the hospital]); *Pharmaceutical Soc'y of New York, Inc. v. New York State Dep't of Social Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995) ("Although [Rule 65(c)] speaks in mandatory terms, an exception to the bond requirement has been crafted for, *inter alia*, cases involving the enforcement of 'public interests' arising out of 'comprehensive federal health and welfare statutes.'"); *WS Int'l, LLC v. M. Simon Zook, Co.*, 2014 WL 1870623, at *3 (3d Cir. May 9, 2014) (no bond required only after trial court's "extensive findings" that the factual predicate for defendant's lone defense was lacking).

**DATED:** September 23, 2014

FLEISCHMAN LAW FIRM
/s/ Keith M. Fleischman

Keith M. Fleischman
FLEISCHMAN LAW FIRM
565 Fifth Avenue, Seventh Floor
New York, NY 10017
(212) 880-9567

STONE BONNER &ROCCO LLP
James P. Bonner
Patrick L. Rocco
145 West 45th Street, Suite 701
New York, New York 10036
(212) 239-4340

Counsel for Claimant LRGP III, LLC
*Attorneys for Plaintiffs*