# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LRGP III, LLC and SLRA INC., | Civil Action No. 14-cv-6937-RJS |
| Plaintiffs, | |
| vs. | |
| CPP INVESTMENT BOARD REAL ESTATE HOLDINGS, INC., GOTHIC CORPORATION, INTERNATIONAL BANK OF RECONSTRUCTION AND DEVELOPMENT AS TRUSTEE FOR THE STAFF RETIREMENT PLAN AND TRUST AND THE RETIRED STAFF BENEFITS PLAN AND TRUST, LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, LIBERTY MUTUAL FIRE INSURANCE COMPANY, and EMPLOYERS INSURANCE COMPANY OF WAUSAU, | |
| Defendants, | |
| and | |
| LIQUID REALTY PARTNERS III, L.P., LIQUID REALTY PARTNERS III-A, L.P., and ARC (GP1) LTD | |
| Proposed Intervenor-Defendants. | |

# MEMORANDUM OF LAW IN OPPOSITION TO PROPOSED INTERVENORS' MOTION TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24

# TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

The Relevant Facts......................................................................................................... 2

    A.    The Parties And The Funds................................................................... 2

    B.    The Management Fees And The Service Fees........................................ 2

    C.    The GP's Deferral And Subsequent Payment Of The Service Fees...................... 6

Argument ........................................................................................................................ 9

I.    Proposed Intervenors Do Not Have Authority To Cause The Funds To Make A Motion To Intervene .......................................................................................... 9

II.    Intervention as of Right Is Not Permissible......................................................... 9

    A.    Proposed Inervenors do not Have an Interest in This Litigation That May be Harmed............................................................................. 10

    B.    Proposed Intervenors' Alleged Interest Is Fully Represented By The Parties in This Litigation....................................................................... 12

III.    The Funds Cannot Intervene Because Adding The Funds as Parties Would Defeat Subject Matter Jurisdiction....................................................................... 13

IV.    Permissive Intervention is not Appropriate ....................................................... 14

Conclusion ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Pennwood Inv. Corp.*,
  392 F.2d 759 (2d Cir. 1968)....................................................................... 10

*Allen v. El Paso Pipeline GP Co., L.L.C.*,
  90 A.3d 1097 (Del. Ch. 2014) ..................................................................... 9

*G-I Holdings, Inc. v. Baron & Budd*,
  01 CIV. 0216 (RWS), 2002 WL 1822929 (S.D.N.Y. Aug. 7, 2002)........................................ 10

*Handelsman v. Bedford Vill. Associates Ltd. P'ship*,
  213 F.3d 48 (2d Cir. 2000)........................................................................ 12

*In re Ambac Fin. Group, Inc., Derivative Litig.*,
  257 F.R.D. 390 (S.D.N.Y. 2009) ................................................................. 14

*Make Up For Ever, S.A. v. SOHO Forever, LLC*,
  198 F.R.D. 56 (S.D.N.Y. 2000) ................................................................. 13

*MasterCard Intern. Inc. v. Visa Intern. Serv. Ass'n, Inc.*,
  471 F.3d 377 (2d Cir. 2006)........................................................................ 9

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007)........................................................................ 13

*New York News, Inc. v. Kheel*,
  972 F.2d 482 (2d Cir. 1992)........................................................................ 11

*New York State Bd of Elections*,
  467 F.3d 141 (2d Cir. 2006)........................................................................ 9

*New York State Dept. of Envtl. Conservation*,
  834 F.2d 60 (2d Cir. 1987)......................................................................... 12

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
  01 CIV.8539 RWS, 2003 WL 22790916 (S.D.N.Y. Nov. 25, 2003) ...................................... 10

*R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*,
  467 F.3d 238 (2d Cir. 2006)........................................................................ 13

*Tachiona ex rel. Tachiona v. Mugabe*,
  186 F. Supp. 2d 383 (S.D.N.Y. 2002)............................................................... 10

*UNI Storebrand Ins. Co., UK Ltd. v. Star Terminal Corp.*,
  1997 WL 391125 (S.D.N.Y. July 11, 1997) ......................................................... 13

**Statutes**

28 U.S.C. § 1367 ................................................................................................................. 13

**Rules**

Fed. R. Civ. P. Rule 24(c) ............................................................................................. 10, 12. 13

Fed. R. Civ. P.19(b) ......................................................................................................... 13

Plaintiffs LRGP III, LLC ("GP") and SLRA, Inc. ("SLRA" or "Affiliate") (collectively, "Plaintiffs"), Inc. hereby oppose the Motion to Intervene Pursuant to Federal Rule of Civil Procedure 24 filed by The Liquid Realty Partners III, L.P., Liquid Realty Partners III-A, L.P., (collectively, the "Funds") and ARC (GP1) LTD ("ARC") (collectively, with the Funds, the "Proposed Intervenors") on September 11, 2014 .

## PRELIMINARY STATEMENT

The motion to intervene in this Action is part of an ill-considered attempt by defendants, who are limited partners of the Funds ("LP Defendants"), to seize control of the Funds without adhering to the procedures set forth in the Funds' limited partnership agreements ("LPAs") and to misappropriate service fees ("Service Fees") earned by an affiliate of GP, the general partner of the Funds.  Plaintiffs filed this action for declaratory relief after LP Defendants sought to replace GP as a general partner of the Funds without following the clearly defined procedures set forth in the LPAs.  As set forth herein, the improper removal was part of a brazen attempt to strong-arm GP to repay Service Fees explicitly authorized under the LPAs that GP earned by providing vital services to the Funds that staved off foreclosure.

The Motion to Intervene fails for several reasons.  First, the Funds' are not authorized to intervene under the LPAs because GP, which has the exclusive ability to cause the Funds to participate in litigation, has not caused the Funds to make such a motion.  The Motion to Intervene also fails because the only issues before the Court involve disputes between GP and Defendants.  The Funds and ARC have no interest in this litigation, let alone an interest not already represented by Plaintiffs or Defendants.

With respect to ARC, its entire argument to intervene is based on the false premise that it has fiduciary duties to the Funds and intervention somehow furthers such fiduciary duties.  In fact, ARC has no fiduciary duties to the Funds because it has not been duly appointed as general

partner of the Funds under the LPAs.  In any case, ARC fails to explain why, even if, contrary to the facts, it were the general partner of the Funds, it has an interest in a dispute between GP and certain limited partners of the Funds.

Similarly, the Funds have no interest, distinct from the interest of GP and Defendants, in settling disputed issues over interpretation of the LPAs.  Moreover, the Proposed Intervenors ignore the fact that the Funds cannot intervene in this action because allowing such intervention would defeat subject matter jurisdiction.

## THE RELEVANT FACTS

This motion is predicated on two fundamental factual premises: (a) the GP improperly paid the Affiliate the Service Fees; and (b) the LP Defendants have properly removed the GP from its role as the Funds' general partner.  As shown below, both are entirely inaccurate.

### A.    The Parties And The Funds

The GP is the general partner of the Funds, which are private equity limited partnerships that invested the Limited Partners' capital commitments in real estate private equity "secondary" transactions.  *See* Declaration of Scott M. Landress ("Landress Decl.") at ¶ 7.  The LP Defendants were among those who invested in the Funds upon their formation in 2006.  *Id.* at ¶ 8. The LP Defendants are large, sophisticated institutional investors that are experienced in the secondary investment business and that relied upon their own attorneys to review the Funds' offering documents and negotiate the Funds' LPAs. *Id*. at ¶ 9.

### B.    The Management Fees And The Service Fees

In the limited partnership agreements for the Funds (the "LPAs"), the GP fully disclosed to the LP Defendants that, as was often the case with respect to similar investment funds, the Funds would pay Liquid Realty's affiliates two types of fees in connection with the operation of the Funds and their investments, i.e. management fees and service fees, respectively.   *Id.* at ¶ 10.

2

First, the management company appointed by the GP received a Management Fee equal to 1.25% of the Funds' net asset value ("NAV") for performing the passive investment advisory and administrative services typical of secondary fund managers.  *Id.* at ¶ 11; LRP III LPA at § 5.9(a); LRP III-A LPA at § 5.9(a).  Those passive services include collecting information from underlying fund managers, analyzing and consolidating that information, conveying financial and performance data to the Funds' limited partners, and calling or distributing investor capital. Landress Decl. at ¶ 11.

Due to the passive nature of the services that secondary fund general partners are expected to provide, their appointed management companies typically charge lower management fees than those charged by the management companies of the direct investment funds that secondary funds generally invest in and depend upon to manage their underlying assets.  *Id.* at ¶ 12.  Consistent with that general rule, at the time of the Funds' inception, direct investment funds often charged management fees as high as 2.00% of committed or invested capital. Landress Decl. at ¶ 13.

Liquid Realty affiliates were not expected, however, to play merely a passive role in the Funds' management.  Rather, the Liquid Realty made clear that Liquid Realty affiliates would provide, and did in fact provide, active services to the Funds that fell well outside the scope of LRA III's passive management services.  *Id.* at ¶ 14; LRP III LPA at § 5.14; LRP III-A LPA at § 5.14.  Indeed, the GP and the Limited Partners, including the LP Defendants, engaged in substantial pre-closing negotiations regarding the specific terms of the LPAs that memorialize the GP's authority to retain the Affiliate to provide such active services.  Landress Decl. at ¶ 17.

The GP also prepared, and made available to the Limited Partners, including the LP Defendants, detailed financial projections including the Management Fees and the additional fees

the Funds were expected to incur for services that fell outside the scope of the Management Fee (the "Service Fees"). *Id.* at ¶ 18 and Ex. 3. Those projected Management Fees and Service Fees were conservatively budgeted, and have proven to significantly exceed the actual fees the Funds have paid, even though the global financial crisis resulted in the Affiliate performing far more extensive services for the Funds than the GP originally envisioned. *See id.* at ¶ 19 and Ex. 3.[1]

In the course of negotiating the LPAs, the Limited Partners secured the right to have the GP form a separate "Advisory Committee" for each Fund (*i.e.,* one for LRP III and another for LRP III-A). The Advisory Committees were to be comprised of a subset of the investors in that respective Fund. *Id.* at ¶ 20. The Advisory Committees were charged with responding to GP requests to resolve conflicts presented to the Advisory Committees by the GP, or approve any "transactions" between the Funds and the GP or its affiliates (such as selling Liquid Realty-affiliated assets to the Funds, buying assets from the Funds, or providing Liquid Realty-affiliated financing to the Funds). *Id.* at ¶ 21. The GP and its affiliates never undertook any "transactions" with the Funds, as the LPAs utilize that term. Landress Decl. at ¶ 21.

In sharp contrast to the Advisory Committees' approval rights with respect to "transactions" between the Funds and the GP or its affiliates, the LPAs were specifically negotiated to *not* require Advisory Committee approval of the GP's decisions to enlist its affiliates to provide "services" to the Funds that third parties would otherwise have to perform (such as arranging, facilitating or managing the acquisition, financing or sale of the Funds' assets, or protecting the Funds' assets from foreclosure). *Id.* at ¶ 22. Rather, the LPAs dictate

---

[1] Specifically, the GP's projections estimated that the Funds would pay total fees of £32,240,726 from inception in 2006 through 2012. *Id.* at ¶ 19. From inception through the payment of the Service Fees in 2014, a period that spans the unforeseen global financial crisis and extends two years longer than originally projected, the Funds actually paid below-budget fees of £27,471,880, a savings of £4,768,846 (or 15%) to the Limited Partners, including the LP Defendants. *Id.* at ¶ 10.

that the arrangements between the Funds and the GP's affiliates with respect to *services* provided

to the Funds need only be "determined by [the GP] to be fair and reasonable" to the Funds.  *Id.* at

¶ 23.

In that regard, the text of each LPA, including the "transactions"-specific proviso added

by the Limited Partners during the negotiation of those agreements, states:

> The Partnership, directly or with respect to any assets in which the
> Partnership is authorized to invest, may, as necessary or appropriate, engage in
> any transaction with or employ or retain [the GP] or any of its respective
> Affiliates to provide services (including, without limitation, administration,
> accounting, financing, investment-level management and servicing, legal, market
> research, mortgage financing and services in connection with the sale, exchange
> or liquidation of any or all of the Portfolio Investments) that would otherwise be
> performed for the Partnership by third parties on terms (including, without
> limitation, the consideration to be paid) that are determined by [the GP] to be fair
> and reasonable to the Partnership, and such Persons may receive from the
> Partnership (and any such other Person) compensation (including, without
> limitation, salary, salary related employment costs and expenses of the employees
> who provide such services and other overhead expenses allocable thereto, as
> reasonably determined by [the GP] based on the time expended by the employees
> who render such services or on a project-by-project basis) in addition to that
> expressly provided for in this Agreement; <u>provided</u>, <u>however</u>, the Advisory
> Committee must approve all such transactions.

LRP III LPA at § 5.14(a); LRP III-A LPA at § 5.14(a)

In light of the fact that the concerted efforts of the Affiliate were vital in preventing the

Funds' lenders from foreclosing upon the Funds' assets, the LP Defendants seek a massive

windfall by denying the Affiliate any payment solely because the GP failed to obtain an

administrative approval from the Advisory Committees.  The result the LP Defendants propose

would be particularly unfair because the LP Defendants cannot even claim that they would have

refused to approve the retention of the Affiliate to provide those services, even had that approval

been required.

    C.    <u>The GP's Deferral And Subsequent Payment Of The Service Fees</u>

Consistent with the LPAs and the GP's previous disclosures, the GP retained the Affiliate to provide a variety of services for the Funds that third parties would otherwise have had to perform.  Landress Decl. at ¶ 28.[2]  The GP consistently disclosed to the LP Defendants that Liquid Realty affiliates would be providing and did, in fact, provide these services to the Funds, albeit without naming the specific entities providing such services to the Funds, including the Affiliate and the certain law firms, accounting firms and other service providers.  *See* Landress Decl. at ¶ 31.  Without the Affiliate's services, which had no precedent in other Liquid Realty-affiliated funds, the LP Defendants could have lost most or all of the capital they committed to the Funds.  Landress Decl. at ¶ 32.

Shortly after the Funds began operations, the global financial crisis struck.  *Id.* at ¶ 32.  That crisis proved particularly devastating for leveraged investments in real estate, such as the assets the Funds held.  *Id.* at ¶ 32.  As a result, following the commencement of the crisis, the GP and the Affiliate exerted extensive efforts: (a) locating opportunities for and negotiating defensive sales of the Funds' assets, the proceeds of which were used to pay down debt balances to temporarily cure the Funds' loan covenant breaches and postpone lender foreclosure; (b) negotiating loan covenant relief agreements that temporarily cured the Funds' loan covenant breaches and postponed lender foreclosure; and (c) negotiating and effecting the recapitalization of the Funds to permanently cure the Funds' loan covenant breaches and thwart the lenders'

---

[2]  Prior to the global financial crisis, those services included: (a) identifying, negotiating and closing the acquisition of the Funds' assets at a discounted price; (b) structuring that transaction to minimize taxes and at-risk capital for the Limited Partners; (c) structuring the debt utilized in acquiring the Funds' assets to maximize early cash flow to the limited partners; (d) structuring the term loan utilized to replace the loan used to acquire the Funds' assets to release the Limited Partners' collateral and generate a distribution of refinancing proceeds; and (e) arranging pre-crisis sales of the Funds' assets to generate distributions of capital gains.  *Id.* at ¶ 29.

concerted efforts to foreclose on all of the Funds' assets.  *Id.* at ¶ 33.[3]  The services that the Affiliate performed protected the LP Defendants against the loss of most or all of the capital they committed to the Funds, which totaled £400 million, or approximately $680 million. *Id.* at ¶ 34.  Furthermore, the quality of the services that the Affiliate delivered is demonstrated by the fact that the Funds' returns, while below original projections, have vastly outperformed those of similar-vintage real estate funds.  *Id.* at ¶ 38.[4]

The GP regularly advised the Limited Partners that Liquid Realty affiliates had secured the performance of such active services, which fell well outside of the scope of the passive services for which LRA III received the Management Fees.  *Id.* at ¶ 35.  Moreover, the LP Defendants accepted and approved of the substantial benefits of those services without ever questioning their apparent propriety and value to the Funds.  *Id.* at ¶ 35.  Despite conducting months of discussions with the GP concerning the Service Fees, the LP Defendants never challenged the amount of the Service Fees (£16,254,023) until *after* the GP pointed out the absence of any such contention in its Arbitration Statement of Claim.  *Id.* at ¶ 36.

During the first fifteen months of the Funds' existence, the GP elected not to pay the Service Fees owed to the Affiliate because it had committed to LP Defendants and other Limited Partners that the GP would maximize the distributions made during the Funds' initial stages before the Funds' interest-only acquisition loan was refinanced.  *Id.* at ¶ 39.  By the time the Funds' first audit was completed in July 2007, the global financial crisis was in full swing.  The

---

[3]  A schedule of the transactions for which the Affiliate earned Service Fees is attached to the Landress Declaration as Exhibit 4.  The GP shared that schedule with the LP Defendants in February 2014.  Landress Decl. at ¶ 30.

[4]  To date, the Funds have returned 65% of invested capital to their Limited Partners (about three times better the median 2006 vintage European real estate fund, which has returned only 17% of invested capital), while additionally retaining significant capital reserves and rights to future asset distributions.  *Id.* at ¶ 38.

Funds' assets ceased producing significant cash flows, the Funds' lenders took control of the

Fund's bank accounts and threatened to foreclose on the Funds' assets, and the GP reserved all

of the Funds' uncalled capital commitments to stave off foreclosure.  *Id.* at ¶ 40.  As a result, the

GP had no capital to pay the Service Fees, and therefore was left with no choice but to continue

to defer the payment of the Service Fee between 2007 and 2010.  *Id.* at ¶ 40.

The LP Defendants' contention that the GP should have accrued the Service Fees on the

Funds' financial statements beginning in 2007 also lacks merit.  The GP has obtained

independent accounting advice that, because the collectability of the Service Fees from the cash-

strapped, highly leveraged, lender-controlled Funds was in serious doubt, accrual would have

been inappropriate.  *See* Landress Decl. at ¶ 41 and Ex. 6.  In any event, the LP Defendants

cannot assert that failing to accrue the fees injured them or the Funds.  *Id.* at ¶ 42.  To the

contrary, the accruals the LP Defendants have now advocated would have rendered the Funds

insolvent, much to the LP Defendants' detriment.  *Id.* at ¶ 42.

By 2010, the Funds had weathered the worst of the global financial crisis and possessed

sufficient cash to pay a portion of the deferred Service Fee to the Affiliate.  *Id.* at ¶ 43.  By  that

time, however, the most active member of LRP III-A's Advisory Committee, Peter Lewis of

Liberty Mutual, an LP Defendant, threatened that the GP would be removed if it made payment

of Service Fees to the Affiliate rather than distributing the cash to the Limited Partners.  *Id.* at

¶ 43.  Therefore, the GP saw no choice but to avoid removal by further deferring payment of the

Service Fee.  *Id.* at ¶ 43.

At year-end 2013, however, the Funds' assets were significantly liquidated, and the

Funds held and controlled sufficient cash to pay the Service Fee in its entirety.  *Id.* at ¶ 44.

Accordingly, in January 2014, after reserving for the Funds over £16 million in cash that would

have been lost but for the success of the GP and the Affiliate in providing active services to the Funds, the GP paid the Affiliate the £16.25 million in Service Fees the Affiliate had earned during the life of the Funds from 2006 through 2013.  *Id.* at ¶ 45.

In February 2014, the GP notified the Limited Partners of that payment.  *Id.* at ¶ 46. Before making the payment, the GP retained EisnerAmper LLP, an independent accounting and consulting firm with considerable experience with the compensation of firms providing professional services to private equity limited partnerships, to evaluate the reasonableness of the amount of the Service Fees.  *Id.* at ¶ 46 and Ex. 7.  The EisnerAmper analysis confirmed that the Service Fees fell well within the range of similar fees charged by the affiliates of other general partners of private equity real estate firms.  *Id.* at ¶ 47 and Ex. 7.  Consistent with EisnerAmper's further advice, the GP plans to accrue the Service Fees in the Funds' 2013 audited financial statements because those fees first became determinable and collectable in 2013.   *Id.* at ¶ 48.

## <u>ARGUMENT</u>

### I.     PROPOSED INTERVENORS DO NOT HAVE AUTHORITY TO CAUSE THE FUNDS TO MAKE A MOTION TO INTERVENE

As set forth in detail in the Opposition to Motion for Preliminary Injunction, LRGP is currently the general partner of the Funds with the sole authority to manage the Funds.  Until limited partners remove LRGP as the general partner pursuant to the terms of the LPAs, only LRGP has the authority to cause the Funds to enter into litigation.  *See* LPAs at § 5.1(a). Therefore, the Funds' Motion to Intervene should be denied because ARC or Defendants do not have the authority under the LPA to cause the Funds to intervene.

### II.     INTERVENTION AS OF RIGHT IS NOT PERMISSIBLE

In any case, the Proposed Intervenors cannot satisfy the standard to intervene as of right as they have failed to demonstrate that "(1) the motion is timely; (2) the applicant asserts an

interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties." *MasterCard Intern. Inc. v. Visa Intern. Serv. Ass'n, Inc.*, 471 F.3d 377, 389 (2d Cir. 2006).

    A.    <u>Proposed Inervenors do not Have an Interest in This Litigation That May be Harmed</u>

Neither the Funds nor ARC have an interest in this litigation that may be injured without intervention. "In order to intervene in a case, an intervenor must have a direct, substantial, and legally protectable interest in the litigation." *Pers. v. New York State Bd of Elections*, 467 F.3d 141, 144 (2d Cir. 2006) (internal quotations omitted). Whether the Defendants' notice of removal was procedurally defective involves only the contractual rights of the parties to this litigation; the Funds have no interest in whether the Court decides such contractual issues in favor of Plaintiff or Defendants. *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1109 (Del. Ch. 2014) (limited partners, not partnerships, were directly injured by alleged breaches of partnership agreement). With respect to distribution of the Service Fees, the Funds are winding down. The Proposed Intervenors do not explain under those circumstances why or how the Funds or ARC would have any interest in how the Funds' remaining assets are allocated between the GP or the Funds' limited partners.

While Proposed Intervenors claim that LRGP has breached a fiduciary duty to the Funds (Def. Br. at 9), the Complaint in this action does not concern such an alleged breach of fiduciary duty and the Funds failed to assert a pleading containing these claims as required under Fed. R. Civ. P. 24(c). *See Abramson v. Pennwood Inv. Corp.*, 392 F.2d 759, 761 (2d Cir. 1968) (affirming dismissal after proposed intervenor "fail[ed] to file a pleading along with his motion

10

papers"); *Bano v. Union Carbide Corp.*, 99 CIV. 11329 JFK, 2005 WL 6800401, at *14 (S.D.N.Y. Aug. 12, 2005) ("[S]upplemental pleadings are necessary to allow defendants and the Court an opportunity to examine whatever claim . . . Intervenors may be asserting, and Intervenors' non-compliance with Fed. R. Civ. P. 24(c) here is not a mere technicality, but is fatal to the motion."); *G-I Holdings, Inc. v. Baron & Budd*, 01 CIV. 0216 (RWS), 2002 WL 1822929, at *1  (S.D.N.Y. Aug. 7, 2002) ("The Movants have failed to file a motion and pleading as required by Fed. R. Civ. P. 24(c). This is sufficient to deny intervention.").  There is no basis to intervene where the Funds have no interest in the pending litigation and only state that they may (or may not) pursue counterclaims in the future.[5]

ARC's contention that it possesses a sufficient right to intervene in this action proceeds from the erroneous premise that the GP's actions are preventing ARC from exercising its supposed responsibilities as the Funds' general partner.  For the reasons Plaintiffs explain in their Preliminary Injunction Opposition, however, ARC is not the Funds' general partner because the LP Defendants have not validly removed the GP from its position as the Funds' general partner.

Specifically, the LP Defendants failed to provide the GP with the valid Notice of Removal that, under the terms of the LPAs, the Limited Partners must serve on the GP at least sixty days prior to removal.  Although the LP Defendants' defective Notice of Removal purported to remove the GP under the LPAs' no fault removal provisions, the LP Defendants

---

[5] Because Proposed Intervenors are noncommittal about their intention to assert counterclaims, this is not a case where the requirements of Fed. R. Civ. P. 24(c) are excused.  The Proposed Intervenors' position with respect to asserting counterclaims has not "been meticulously set forth in . . .  briefs filed in conjunction with motion practice." *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393 (S.D.N.Y. 2002) (*cited by* Proposed Intervenor at 1 n.1).  Additionally, because Proposed Intervenors stated that they may assert counterclaims, this is not a case where the Proposed Intervenors "merely adopt a pleading of another party." *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 01 CIV.8539 RWS, 2003 WL 22790916 (S.D.N.Y. Nov. 25, 2003) (internal quotations omitted) (*cited by* Proposed Intervenor at 1 n.1).

barred the GP in that document from making the payments required by the LPAs prior to effecting such a removal.  *See* P.I. Opp. at 10-11.  Furthermore, while the defective Notice of Removal purported to invoke the LPAs' for Cause removal provisions, the LP Defendants did not institute the arbitration the LPAs require for assessing whether Cause for removal exists.  *See* P.I. Opp at 11.  Although the GP has now commenced that Arbitration, the arbitrator has not made the required assessment of whether Cause for removal existed.

As a result, the LP Defendants have not satisfied the requirements for removing the GP under either the no fault or Cause removal provisions of the LPAs.  The GP, not ARC, is therefore the Funds' general partner.  Accordingly, ARC possesses no interest in the disputes currently before the Court and no right to intervene in this action.  *See, e.g., New York News, Inc. v. Kheel,* 972 F.2d 482, 485 (2d Cir. 1992) (to demonstrate a right to intervene, a movant must "show an interest in the action").

### B. Proposed Intervenors' Alleged Interest Is Fully Represented By The Parties in This Litigation

To the extent that the Funds or ARC have an interest in resolution of the disputed issues, their interests are fully represented by Defendants.  "So long as the party has demonstrated sufficient motivation to litigate vigorously and to present all colorable contentions, a district judge does not exceed the bounds of discretion by concluding that the interests of the intervenor are adequately represented."  *Natural Res. Def. Council, Inc. v. New York State Dept. of Envtl. Conservation*, 834 F.2d 60, 62 (2d Cir. 1987).  Here, Proposed Intervenors concede that "Defendants intend to defend vigorously against LRGP's claims."  Def. Br. at 10.  While the Funds claim that they *may* bring counterclaims that cannot be brought by Defendants, they have, as discussed above, failed to attach such counterclaims to their motion pursuant to F.R.C.P. 24(c).

Moreover, ARC's claims that its interest are not represented in this litigation are especially weak as ARC has never specified what its interests are, apart from its dubious claim that it has fiduciary duties to the limited partners of the Funds. Because ARC has not been duly appointed as general partner of the Funds, they have no fiduciary duty to the Funds or limited partners, nor have the Limited Partners expressed any reason or interest in pursuing the fiduciary rights ARC claims to owe the Limited Partners. In short, ARC's request to intervene is a sham.

## III. THE FUNDS CANNOT INTERVENE BECAUSE ADDING THE FUNDS AS PARTIES WOULD DEFEAT SUBJECT MATTER JURISDICTION

It is settled law that "[f]or purposes of diversity jurisdiction, limited partnerships have the citizenship of each of its general and limited partners." *Handelsman v. Bedford Vill. Associates Ltd. P'ship*, 213 F.3d 48, 52 (2d Cir. 2000). Consequently, allowing the Funds to intervene as Defendants would defeat diversity jurisdiction. The Funds and LRGP are both citizens of California because LRGP, the general partner of the Funds, is a citizen of California.[6] Landress Decl. at ¶ 1.

Moreover, this Court does not have discretion to exercise supplemental jurisdiction over LRGP's claims for declaratory relief if the Funds are added as defendants under Rule 24. "[T]he district courts shall not have supplemental jurisdiction. . . over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure." 28 U.S.C. § 1367. "[I]t is clear that a diversity-destroying party joined after the action is underway may catalyze loss of jurisdiction." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 179 (2d Cir. 2007). Therefore, the Court would be divested of subject matter jurisdiction if the Funds were permitted to intervene.

---

[6] In addition, California Institute of Technology, a member of LRP III, is a citizen of California.

Where intervention as of right would defeat subject matter jurisdiction, the Court must determine "whether the action should be allowed to proceed among those already parties, or whether it should be dismissed for failure to join an indispensable party pursuant to Rule 19(b)." *UNI Storebrand Ins. Co., UK Ltd. v. Star Terminal Corp.*, 96 CIV. 9556 (DLC), 1997 WL 391125, at * 3 (S.D.N.Y. July 11, 1997).   Dismissal is only required where Court finds that it cannot proceed in "equity and good conscience."   *Make Up For Ever, S.A. v. SOHO Forever, LLC*, 198 F.R.D. 56, 59 (S.D.N.Y. 2000) (citing Fed. R. Civ. P. 19(b)).   Proposed Intervenors do not argue that they are indispensable parties and, as discussed above, lack the direct interest in this litigation that is required to succeed in that argument.   Therefore, this case should be allowed to proceed without joining the Funds.

## IV.      PERMISSIVE INTERVENTION IS NOT APPROPRIATE

The Proposed Intervenors' request for permissive intervention should be denied for similar reasons as their request to intervene as a matter of right.   "The court considers substantially the same factors whether the claim for intervention is 'of right' under Fed.R.Civ.P. 24(a)(2), or 'permissive' under Fed.R.Civ.P. 24(b)(2)."   *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240-41 (2d Cir. 2006).   *See also In re Ambac Fin. Group, Inc., Derivative Litig.*, 257 F.R.D. 390, 394 (S.D.N.Y. 2009) (denying motion for permissive intervention where "interests of the Proposed Interveners are adequately represented by the plaintiffs in this action.").   As discussed above, Proposed Intervenors' motion should be denied because the Funds and ARC have not articulated any interest in this litigation not being adequately represented by Defendants and the Court would lose subject matter jurisdiction if the Funds intervened in this action.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Proposed Intervenors' Motion to Intervene.


**DATED:** September 23, 2014

<div style="margin-left: 40%;">

**FLEISCHMAN LAW FIRM**

/s/ Keith M. Fleischman

Keith M. Fleischman
FLEISCHMAN LAW FIRM
565 Fifth Avenue, Seventh Floor
New York, NY 10017

**STONE BONNER &ROCCO LLP**
James P. Bonner
447 Springfield Avenue
Second Floor
Summit, New Jersey 07901
(908) 516-2045
Counsel for Claimant LRGP III, LLC
*Attorneys for Plaintiffs*

</div>

15